**COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellant, Cross-Appellee,**

v.

**Nelson Bunker HUNT et al., Defendants-Appellees, Cross-Appellants.**

**Nos. 77–1672, 77–2086 and 77–2087.**

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1978.

Decided Jan. 8, 1979.

Petition for Clarification Denied Feb. 15, 1979.

1212

Richard E. Nathan, Washington, D. C., for plaintiff-appellant, cross-appellee.

John V. Ryan, III, Chicago, Ill., for defendants-appellees, cross-appellants.

Before SWYGERT, Circuit Judge, MARKEY, Chief Judge,* and TONE, Circuit Judge.

SWYGERT, Circuit Judge.

This case presents several issues arising out of a complaint brought by the Commodity Futures Trading Commission, pursuant to the Commodity Exchange Act, against seven members of the Hunt family and an affiliated company. The complaint was instituted by the Commission on April 28, 1977 to compel the defendants to comply with limits established by the Commission on the speculative position that any individual or group may have in soybean futures contracts. See Commodity Exchange Act, § 4a(1), 7 U.S.C. § 6a(1) (Supp.1978); Rule 150.4, 17 C.F.R. § 150.4 (1977).

The Commission's complaint alleges that from at least January 17, 1977 and continuing to the commencement of the court action, two brothers, Nelson Bunker Hunt and William Herbert Hunt, five of their children, and a corporation they control, had been exceeding collectively the limit of three million bushels that had been set for soybean futures contracts. The complaint sought preliminary and permanent injunctions against future violations of these limits, the disgorgement of any profits the Hunts had obtained as a result of their unlawful conduct, and an order requiring the Hunts to liquidate all existing positions in soybean futures in excess of the speculative limits. Contemporaneous with the filing of the complaint, the Commission, pursuant to section 8a(6) of the Commodity Exchange Act, 7 U.S.C. § 12a(6) (1978), publicly disclosed the soybean trading activity and positions of the Hunts.

During the first week in May 1977 the Hunts filed an answer to the Commission's complaint in which they sought to enjoin the Commission from making any further disclosures of their soybean positions. The Hunts also asserted claims for money damages from the Commission and several of its employees for injuries incurred as a result of the Commission's publication of their trading positions. On May 17, 1977 the Hunts moved for a preliminary injunction prohibiting any further disclosure of their soybean trading activity. The district court, on May 19, 1977, enjoined the Commission from making public the Hunts' holdings, purchases, sales or positions in the futures market. The Commission appealed this order on May 20, 1977.

On September 28, 1977, the district court, after hearings on the Commission's motion for a preliminary injunction, issued a memorandum opinion accompanied by findings of fact and law, and entered a judgment order. Commodity Futures Trading Comm. v. Hunt, No. 77–C–1489 (N.D.Ill., Sept. 28, 1977). The lower court concluded that the Hunts, acting in concert, had acquired soybean futures in excess of the three million bushel limit prescribed by regulation, thereby violating Rule 150.4 and section 4a(1) of the Commodity Exchange Act. The court, however, denied the Commission's motion for an order enjoining future violations of the limits and rejected the Commission's request for disgorgement of the Hunts' illegal profits. The lower court also rejected the counterclaim and third-party claims brought by the Hunts.

The Commission appealed from the lower court's decision, arguing that both the injunction and the ancillary relief of disgorgement should have been granted. The Hunts cross-appealed, seeking to overturn

* The Honorable Howard T. Markey, Chief Judge of the United States Court of Customs and Patent Appeals, sitting by designation.

the district court's declaratory judgment that the Hunts had violated the speculative limit, and challenging the validity of the regulation itself. The Hunts also challenged the dismissal of their counterclaim and third-party claims. The Commission's appeal and the Hunts' cross-appeal were consolidated in November 1977 with the Commission's earlier appeal of the lower court's injunction against publication of trading information regarding the Hunts.

## I. *Validity of the Speculative Limit Regulation: Rule 150.4*

Section 4a(1) of the Commodity Exchange Act, 7 U.S.C. § 6a(1), authorizes the Commodity Futures Trading Commission to set commodity trading limits. Congress concluded that excessive speculation in commodity contracts for future delivery can cause adverse fluctuations in the price of a commodity, and authorized the Commission to restrict the positions held or trading done by any individual person or by certain groups of people acting in concert.[1] Pursuant to this statutory authority, the Commodity Exchange Authority, the predecessor of the Commodity Futures Trading Commission, established trading limits on a variety of commodities, including soybeans. In 1951 the Authority set the soybean speculative position limit at one million bushels, 16 Fed.Reg. 8107 (Aug. 13, 1951). The Authority raised the limit to two million bushels in 1953, 18 Fed.Reg. 7230–31 (Nov. 14, 1953), and to three million bushels in 1971, 36 Fed.Reg. 1263 (June 6, 1971). This three million bushel position limit, Regulation 150.4, 17 C.F.R. § 150.4 (1977),[2] was in effect at the time of the Hunt family soybean transactions.

1. Section 4a(1) of the Commodity Exchange Act, 7 U.S.C. § 6a(1), provides in pertinent part:

 Excessive speculation in any commodity under contracts of sale of such commodity for future delivery made on or subject to the rules of contract markets causing sudden or unreasonable fluctuations or unwarranted changes in the price of such commodity, is an undue and unnecessary burden on interstate commerce in such commodity. For the purpose of diminishing, eliminating, or preventing such burden, the commission shall, from time to time, after due notice and opportunity for hearing, by order, proclaim and fix such limits on the amounts of trading which may be done or positions which may be held by any person under contracts of sale of such commodity for future delivery on or subject to the rules of any contract market as the commission finds are necessary to diminish, eliminate, or prevent such burden. In determining whether any person has exceeded such limits, the positions held and trading done by any persons directly or indirectly controlled by such person shall be included with the positions held and trading done by such person; and further, such limits upon positions and trading shall apply to positions held by, and trading done by, two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single person. Nothing in this section shall be construed to prohibit the commission from fixing different trading or position limits for different commodities, markets, futures, or delivery months.

2. Regulation 150.4, 17 C.F.R. § 150.4 (1977), states:

 The following limits on the amount of trading under contracts of sale of soybeans for future delivery on or subject to the rules of any contract market, which may be done by any person, are hereby proclaimed and fixed, to be in full force and effect on and after June 26, 1971;

 (a) Position limit. The limit on the maximum net long or net short position which any person may hold or control in soybeans on or subject to the rules of any one contract market is 3,000,000 bushels in any one future or in all futures combined.

 (b) Daily trading limit. The limit on the maximum amount of soybeans which any person may buy, and on the maximum amount which any person may sell, on or subject to the rules of any one contract market during any one business day is 3,000,000 bushels in any one future or in all futures combined.

 \* \* \* \* \* \*

 (e) Definition. As used in this part, the word "person" imports the plural or singular and includes individuals, associations, partnerships, corporations, and trusts.

 (f) Application of limits. The foregoing limits upon positions and upon daily trading shall be construed to apply, respectively, to positions held by, and trading done by, two or more persons acting pursuant to an expressed or implied agreement or understanding, the same as if the positions were held by, or the trading were done by, a single individual.

The Hunts present multiple challenges to the soybean trading regulation, contending that there were procedural defects in its adoption and that it is an arbitrary and capricious exercise of administrative authority. The essence of the Hunts' attack on the validity of the regulation is their substantive contention that there is no connection between large scale speculation by individual traders and fluctuations in the soybean trading market.

 The procedures used in the adoption of the speculative limits contemplated in the Commodity Exchange Act § 4a(1), 7 U.S.C. § 6a(1), must satisfy the rules of the Administrative Procedure Act regarding informal agency rulemaking. 5 U.S.C. § 553. *See United States v. Allegheny-Ludlum Steel Corp.,* 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972); *United States v. Florida East Coast RR,* 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). These rules were followed by the Commodity Exchange Authority when it raised the soybean trading limit from two to three million bushels. The Authority published the proposed changes in the Federal Register, 36 Fed.Reg. 1340 (1971), and there was opportunity for written comment. In addition, the Authority held a hearing on the proposal. The agency considered the material presented and ultimately amended Regulation 150.4 by raising the limit.[3]

The Hunts also claim that Regulation 150.4 is invalid and unenforceable because it represents an arbitrary and capricious decision by the Commodity Exchange Authority. They argue that the Authority failed to consider relevant factors in its decision to set the soybean trading limit at three million bushels. The substance of the Hunts' argument is that the Authority made no analysis of the relationship between the size of soybean price changes and the size of the change in the net positions of large traders. They argue that there is no direct relationship between these phenomena, and, therefore, the regulation limiting the positions

and the trading of the large soybean traders is unreasonable.

 The appropriate standard for reviewing agency decision-making pursuant to section 553 of the Administrative Procedure Act is described by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971):

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. at 823. *See also American Meat Inst. v. Environmental Protection Agency,* 526 F.2d 442, 452–53 (7th Cir. 1975). In assessing whether the Commodity Exchange Authority's three million bushel limit was an arbitrary or capricious means to achieve the congressionally articulated purpose of preventing excessive speculation, it must be remembered that the fact that "some other remedial provision might be preferable is irrelevant." *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 371, 93 S.Ct. 1652, 1662, 36 L.Ed.2d 318 (1973). In situations in which

> reasonable minds may differ as to which of several remedial measures should be chosen, courts should defer to the informed experience and judgment of the agency to whom Congress delegated appropriate authority. *Northwestern Elec. Co. v. FPC,* 321 U.S. 119, 124, 64 S.Ct. 451, 88 L.Ed. 596 (1944); *National Broadcasting Co. v. United States,* 319 U.S. 190, 224, 63 S.Ct. 997, 87 L.Ed. 1344 (1943);

---

**3.** The propriety of the procedures employed by the Commodity Exchange Authority in the 1971 amendment to Regulation 150.4 was upheld

previously in *Economou v. Butz,* 370 F.Supp. 361 (S.D.N.Y.1974).

*American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 236, 57 S.Ct. 170, 81 L.Ed. 142 (1936).

*Id.* at 371–72, 93 S.Ct. at 1662.

■ The Hunts point to a variety of sources to substantiate their claim that the soybean position and trading limit is arbitrary and capricious. For the most part they allege that the Commodity Exchange Authority failed to consider the relevant factors in reaching its determination. The Hunts cite the Ham Study of 1971, the Imel Study of 1973, the testimony of their expert witness, Dr. T. A. Hieronymus, and even recent statements by a commissioner of the Commodities Futures Trading Commission questioning the three million bushel limit. Virtually all of the evidence the Hunts offered to challenge the three million bushel limit, however, was not part of the administrative record which formed the basis for the Commodity Exchange Authority's 1971 decision to raise the limit to three million. The law is well settled that the administrative record already in existence—not some new record made initially in the reviewing court—should be the focus of judicial review. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *United States v. Nova Scotia Food Products Corp.,* 568 F.2d 240, 250 (2d Cir. 1977). In fact, most of the evidence cited by the Hunts is found in reports or testimony developed well after the promulgation of the 1971 trading limit. Last term the Supreme Court stated:

> As we have said in the past: "Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed]. . . . If upon the coming down of the order litigation might demand rehearing as a matter of law because some new circumstances has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consumated in an order that would not be subject to reopening." *Interstate Commerce*

*Commission v. Jersey City,* 322 U.S. 503, 514–515, [64 S.Ct. 1129, 88 L.Ed. 1420] (1944). *See also United States v. Interstate Commerce Commission,* 396 U.S. 491, 521 [90 S.Ct. 708, 24 L.Ed.2d 700] (1970).

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 554, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). In *Vermont Yankee* the Court remonstrated a party objecting to an administrative regulation for cryptically referring to matters that "ought to be" considered in the administrative proceedings, and then judicially attacking the agency's determination for failing "to consider matters 'forcefully presented.'" *Id.* 435 U.S. at 544, 98 S.Ct. at 1217. And while an administrative agency must consider "the relevant factors" in its decisionmaking, *Citizens to Preserve Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. 814, we cannot permit this requirement to become a device by which parties can thwart enforcement of an established regulation by offering new evidence challenging the wisdom of the regulation in the context of the judicial enforcement proceeding. The reports and testimony presented by the Hunts simply provide different opinions regarding the need for the three million bushel limit in the present soybean market. There is no indication that the Commodity Exchange Authority ignored any particular set of "relevant factors" in reaching its determination. *See Citizens to Preserve Overton Park, supra,* 401 U.S. at 411–13, 91 S.Ct. 814.

■ The Hunts do rely on one report, the Callander Report, which was prepared by the Commodity Exchange Authority to guide its decision regarding soybean trading limits and, importantly, was made part of the administrative record of the agency's decision to raise the limit from two to three million bushels. The Hunts isolate a sampling of quotations from this report which would seem to suggest that the dangers of large scale commodity trading are minimal. The Callander Report at other points, however, does discuss the adverse effects large scale trading can have on the market. And

the report concludes that the soybean limit should be raised from two to three million bushels. The statements in the report minimizing the dangers of large scale trading should be viewed in the context in which they were written. The Commodity Exchange Authority, operating under an express congressional mandate to formulate limits on trading in order to forestall the evils of large scale speculation, was deciding whether to raise its then existing limit on soybeans. Naturally the language in a report concluding that the limit should be raised would not constantly focus on the dangers of large scale trading; a case had to be made to justify raising the trading limits. Thus, it is not unusual that the administrative record supporting the June 1971 soybean trading regulation is not constantly focused on the relationship between large scale trading and adverse price fluctuations. Neither this fact, nor the possibility that reasonable men may disagree about the wisdom of the agency's conclusion, renders the regulation arbitrary or capricious. *See City of DesPlaines v. Metropolitan Sanitary Dist.*, 552 F.2d 736, 737 (7th Cir. 1977). There is ample evidence in the administrative record to support the regulation.

## II. *Violation of the Speculative Limits*

The district court found that Nelson Bunker Hunt and William Herbert Hunt, five of their children, and a corporation they control had exceeded the speculative limit of three million bushels that had been established for soybean futures contracts by Rule 150.4, promulgated pursuant to section 4a(1) of the Commodity Exchange Act. 7 U.S.C. § 6a(1). The Hunts claim that the district court misinterpreted section 4a(1) in applying it to the Hunts' activities, and that there was no factual basis for a finding that the Hunts had violated the statute and its corollary regulation.

 Section 4a(1) provides for the aggregation of commodity positions for purposes of determining whether the speculative limit has been exceeded, when one person "directly or indirectly" controls the trading of another, or when two persons are acting "pursuant to an express or implied agreement or understanding . . . ." 7 U.S.C. § 6a(1). Thus, even though two persons acting in concert might each individually have a commodity position below the limit, if their combined position exceeds the limit they have violated the statute. Further, contrary to the arguments advanced by the Hunts, there is nothing in either the statutory language or legislative history which suggests that intent—either to affect market prices or specific intent to exceed the speculative limits—is a necessary element of a violation of section 4a(1). In fact, the Senate Report to the 1968 amendments to the statute states that a speculative futures position exceeding the limit can constitute a statutory violation "regardless of how or when or for what purpose such position was created." 1968 U.S.Code Cong. & Admin.News 1673, 1678. A violation occurs simply when an individual or several individuals acting in concert exceed the commodity position limits set pursuant to the statute.

 The Hunts contend that the evidence compiled in the district court is insufficient to prove a violation of the statute. In assessing the district court's findings, we must defer to the reasonable inferences of the trial court. Fed.R.Civ.P. 52(a). *See SEC v. Parklane Hoisery Co.*, 558 F.2d 1083, 1086 (2d Cir. 1977); *Markiewicz v. Greyhound Corp.*, 358 F.2d 26 (7th Cir.), *cert. denied*, 385 U.S. 828, 87 S.Ct. 64, 17 L.Ed.2d 65 (1966). Under this rule, the trial court's conclusion that the Hunts violated section 4a(1) by collectively exceeding the speculative limits of Rule 150.4 must be upheld.

A brief survey of the Hunt family's complicated soybean trading substantiates this conclusion. Nelson Bunker Hunt and William Herbert Hunt were the principal family figures in these transactions. They are brothers, and the chief officers of the Hunt Energy Corporation. In mid–1976 N. B. and W. H. Hunt entered the soybean market. By August 1 each brother consistently held a long position at the three million bushel limit, usually for the closest delivery month. Through a series of purchases—the

date, timing, and size of which were virtually identical—each brother, by January 1977, held a three million bushel position in March 1977 soybeans. Over the next six weeks each of the Hunt brothers entered into eight transactions—on the same days, using the same broker, involving virtually identical quantities and prices. Throughout this time an employee of the Hunt Energy Corporation, Charles Mercer, prepared commodity position statements for the brothers reflecting their combined holdings and unrealized profits and losses.

On February 25, with both N. B. and W. H. Hunt at the personal position limit, N. B. Hunt ordered a purchase, through one of his brokers, of 750,000 bushels of May soybeans in the name of his son, Houston Hunt. On March 3 he ordered the purchase of 750,000 May bushels to be allocated equally among accounts he had opened on behalf of his three daughters. And, although the bank accounts of the various children lacked the funds to cover these purchases, the transactions were made possible by a short-term transfer of interest-free funds from their father's account. N. B. Hunt's children did not participate in these initial soybean transactions made in their names: they had nothing to do with opening the accounts, placing the first order, or arranging financing for their purchases. And once these family members had entered the soybean market, their transactions were added to the composite report sent to N. B. Hunt.

A similar relationship existed between W. H. Hunt and his son, Douglas. On March 1 W. H. Hunt and his wife transferred their interests in Hunt Holdings, Inc. to their three sons. Less than a week later Douglas Hunt personally and through Hunt Holdings, whose trading he controlled, began purchasing July soybeans. These purchases were financed in part by money advanced by his father.

The overall involvement of the Hunt family in the soybean market also was increased by the spread trading—purchasing old crop contracts and selling contracts in new crop markets—of N. B. and W. H. Hunt. Some of N. B. Hunt's purchases in this period were financed by temporary advances from his brother. As of April 14, 1977 the Hunt family's collective position involved over twenty-three million bushels of old crop soybeans: over 10.8 million in May futures, 7.7 million in July futures, and 5.2 million in August futures. These collective figures, of course, put the Hunt family well over the speculative limits in soybeans set by Rule 150.4. And the evidence presented in the district court clearly indicates that the individual positions of the family members should be aggregated. Thus, the Hunt family soybean transactions constituted a violation of section 4a(1) of the Commodity Exchange Act, 7 U.S.C. § 6a(1).

### III. *Lower Court's Refusal to Grant Injunction Against Hunts*

Pursuant to section 6c of the Commodity Exchange Act, 7 U.S.C. § 13a–1, the Commodity Futures Trading Commission is authorized to institute an action seeking injunctive relief whenever it appears that any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation, or order thereunder." Section 6c further provides that upon a proper showing, a permanent or temporary injunction or restraining order shall be granted by the district court without bond. The discretion afforded the district court in deciding whether to issue such relief, while broad, *see United States v. W. T. Grant*, 345 U.S. 629, 633–34, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), is not completely unfettered. This court has noted that when Congress has integrated traditional modes of equitable relief into a statutory enforcement scheme, the court's equitable power should be exercised in harmony with the overall objectives of the legislation. *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53 (7th Cir. 1972). In that case we cautioned that

. . . while trial courts should properly be accorded wide latitude in fashioning equitable remedies in cases of this type, it

is the inescapable function of the appellate court to make sure that the fashioned remedy meets that criterion in accordance with the regulatory scheme and adequately serves the particularized needs of the case before the court. Although injunctive relief is never automatic upon the showing of a violation of the Act or regulations (*see Hecht Co. v. Bowles* [321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754], *supra*), we should not hesitate to reverse an order denying such relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved.

*Id.*

■■■■ Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations. *SEC v. Advance Growth Capital Corp., supra,* at 54; *Commodity Futures Trading Comm. v. British American Commodity Options Corp.,* 560 F.2d 135, 142 (2d Cir. 1977); *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir. 1975). While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations." *SEC v. Management Dynamics, Inc., supra,* at 807. *See also Commodity Futures Trading Comm. v. British American Commodity Options Corp., supra,* at 142; *SEC v. Advance Growth Capital Corp., supra,* at 53. In drawing the inference from past violations that future violations may occur, the court should look at the "totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant." *SEC v. Management Dynamics, Inc., supra,* at 807; *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8 (2d Cir. 1977).

■■■■ Other circuit decisions analyzing the problem whether or not to grant statutory injunctive relief after a violation has been proven have looked to a variety of factors to determine whether there is a reasonable likelihood of future misconduct. The fact that a violator has continued to maintain that his conduct was blameless has prompted several courts to look favorably on injunctive relief. *See SEC v. Shapiro,* 494 F.2d 1301, 1308 (2d Cir. 1974); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2d Cir. 1972). Similarly, when a defendant persists in its illegal activities "right up to the day of the hearing in the district court . . . the likelihood of futures violations, if not restrained, is clear." *Commodity Futures Trading Comm. v. British American Commodity Options Corp., supra,* at 142 (citations omitted). More importantly, courts have analyzed the nature of the past misconduct and the violator's occupation or customary business activities to determine whether an injunction should be granted. When the violation has been founded on systematic wrongdoing, rather than an isolated occurrence, a court should be more willing to enjoin future misconduct. *SEC v. Manor Nursing Centers Inc., supra,* at 1100. And when a defendant, because of his professional occupation or career interest, will be in a position in which future violations could be possible, relief is appropriate. *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90 (2d Cir. 1978).

■■■■ In light of these standards, we conclude that the district court was incorrect in denying the injunctive relief sought by the Commission. It would be anomalous to conclude, as did the district court, that the carefully organized, large scale, and long term soybean trading activities of the Hunts constituted a violation of Section 4a(1) of the Commodity Exchange Act, but that relief under section 6c of the Act was inappropriate. Their misconduct was systematic and carefully preconceived. Their soybean positions which were challenged by the Commission were maintained throughout the enforcement proceedings until the futures contracts came to their natural conclusion. Further, the Hunts consistently maintained that their conduct was blameless. And finally, the prominent place of

the Hunt family in the commodity markets generally, suggests that it is not unlikely that they will be regular participants in the soybean markets in the future.[4] Thus, they will be in a position in which they are capable of committing future violations. Given the presence of all these factors, injunctive relief should have been granted.

## IV. Lower Court's Denial of Commission's Request for Disgorgement

■■■ The original complaint of the Commission sought, in addition to injunctive relief, an order compelling the Hunts to disgorge all profits they obtained as a result of their illegal activities. Although no hearing on the merits of the propriety of this relief was held in the trial court, the

request for an order of disgorgement was denied. The lower court's rejection of the Commission's prayer for disgorgement was precipitous, and we remand the issue to the district court for reconsideration in light of the following observations.[5]

Disgorgement of illegally obtained profits has been ordered in a number of Securities Exchange Commission judicial enforcement proceedings. See, e. g., SEC v. Commonwealth Chemical Securities, Inc., 574 F.2d 90 (2d Cir. 1978); SEC v. Shapiro, 494 F.2d 1301 (2d Cir. 1974); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). In these cases, disgorgement was ordered despite the fact

---

**4.** Virtually all of the planning and decisionmaking regarding the Hunts' trading activities was done by the brothers, W. H. and N. B. Hunt. And, prior to the transactions in question here, they were the only defendants significantly active in the commodities markets. In fact, N. B. Hunt's children had no knowledge or experience regarding commodity trading. It could be argued that an injunction is appropriate against only W. H. and N. B. Hunt and Hunt Holdings, Inc. However, the record in this case clearly indicates that the younger generation of the Hunt defendants possess the financial wherewithal to be substantial participants in the soybean market. It is not unlikely that they, either personally or with the advice of the Hunt family financial counselors, will be in a position to violate the regulation in the future. This fact, coupled with their complicity in the systematic wrongdoing which constituted the statutory violation in the instant case, warrants the imposition of injunctive relief.

**5.** The dissenting opinion argues, inter alia, that because the Commission never "lack[ed] opportunity to press for the disgorgement remedy it specifically sought . . . in its complaint" at the hearings held in the district court, the disgorgement issue should not be remanded for more complete consideration. Infra p. 1233. The dissent fails to note, however, that the proceedings before the trial judge were on a renewed motion for a preliminary injunction, not permanent relief. These hearings focused only on the validity of the regulation, its application to the Hunts, and the appropriateness of an injunction against the Hunts restraining their future trading; neither plaintiff nor defendants addressed the disgorgement question in their trial motions or in their posttrial memoranda and proposed conclusions of law. Plaintiff's failure to raise the disgorgement issue in these hearings must be viewed against the

background of the mutual effort of plaintiff, defendants, and the court to expedite resolution of the motion for preliminary relief. See, e. g., Statement of Mr. Ryan, counsel for defendants, Transcript, July 5, 1977, p. 9; reprinted in Supplementary Appendix, Hunt v. Commodity Futures Trading Commission, No. 78–1055, p. 42sa.

The dissent also refers to a statement made by the Commission in the administrative proceeding which emphasizes the completeness of the district court hearings. Infra, p. 1232. This statement, however, presumably was made in the context of the Commission's attempt to use the doctrine of collateral estoppel to establish only that the Hunts violated the commodity trading statute. Given that the Commission was seeking different relief in the administrative proceeding than it had in the district court, it is improbable that it would have made an argument based on principles of prior adjudication with respect to what forms of relief were appropriate. The Commission, moreover, "having recognized that the district court's findings had been made only for purposes of preliminary relief," Brief of Appellee, Hunt v. Commodity Futures Trading Commission, No. 78–1055, p. 10 n. 14, amended its motion for summary disposition of the administrative complaint (presumably the source for the quotation used by the dissent) and dropped its collateral·estoppel contention, on February 15, 1978.

Given this background, it was not inappropriate for the Commission to postpone presentation of its evidence and arguments in support of its prayer for disgorgement until after the resolution of the motion for preliminary relief; more importantly, the Commission should not be precluded from offering these arguments to the district court on remand.

that there was no specific, express authority for this remedy in the Securities Exchange Act. Further, the Second Circuit in these cases explicitly rejected the objection that disgorgement is a penalizing rather than a remedial, equitable device, correctly reasoning that disgorgement does not penalize, but merely deprives wrongdoers of ill-gotten gains. *See, e. g., SEC v. Texas Gulf Sulphur Co., supra,* at 1308; *SEC v. Shapiro, supra* at 1309.

The question whether disgorgement is an appropriate form of ancillary relief in the Commodity Exchange Act context, as in the Securities Exchange Act setting, is, however, a closer one. Both sections 21(e) and 27 of the Securities Exchange Act discuss remedies for the enforcement of the norms of the Act. Section 21(e) only authorizes the Securities Exchange Commission to seek injunctive relief. Section 27, however, grants the district court general equitable powers to enforce the Act. The leading case authorizing the disgorgement remedy rested its conclusion, in part, on the general remedial powers possessed by the district court pursuant to section 27. *SEC v. Texas Gulf Sulphur Co., supra,* at 1307. Section 21(e) was relevant to that court's reasoning only insofar as the court rejected the objection that section 21(e) limits the type of remedy the Securities Exchange Commission can pursue to injunctions.

Section 6c of the Commodity Exchange Act tracks the injunction language of section 21(e), but adds the broadening language that the Commodity Futures Trading Commission may bring an action in the district court "to enforce compliance with this chapter, or any rule, regulation or order thereunder . . . ." 7 U.S.C. § 13a–1. There is, however, no provision in the Commodity Exchange Act comparable to the express grant of equitable authority found in section 27 of the Securities Exchange

Act. Thus, the principal statutory authority the Second Circuit has relied on in approving disgorgement in the Securities Exchange Act context is absent from the Commodity Exchange Act.

In the *Texas Gulf Sulphur* decision, however, the court referred to cases in other contexts in which the Supreme Court has upheld

> the power of the Government without specific statutory authority to seek restitution, and has upheld the lower courts in granting restitution, as an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief. *Mitchell v. Robert DeMario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); *United States v. Moore,* 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582 (1951); *Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086 90 L.Ed. 1332 (1946).

*Id.*

And in these cases there was no explicit statutory expression, like section 27, of the court's equitable enforcement powers; the authority to grant disgorgement is found in the traditional equity powers of a court. *See Renegotiation Bd. v. Bannercraft Clothing Co.,* 415 U.S. 1, 19, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974).

In *Porter v. Warner Holding Co.,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), for example, the Supreme Court dealt with an action brought by the Price Administrator pursuant to the Emergency Price Control Act to enjoin the collection of excessive rents and to compel reimbursement of money collected by landlords as a result of past violations. Assessing language describing the authority of the district court which parallels the language of section 6c of the Commodity Exchange Act,[6] the Court stated:

> order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond. 56 Stat. 23, 33.

**6.** The relevant statutory provision, section 205(a) of the Emergency Price Control Act of 1942, states:

Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an

. . . the Administrator invoked the jurisdiction of the District Court to enjoin acts and practices made illegal by the Act and to enforce compliance with the Act. Such a jurisdiction is an equitable one. Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. . . . [T]he court may go beyond the matters immediately underlying its equitable jurisdiction . . . and give whatever other relief may be necessary under the circumstances.

\* \* \* \* \* \*

Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.

*Id.* at 398, 66 S.Ct. at 1089. *See also Mitchell v. DeMario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). In *Porter,* the Court reasoned that an order for restitution could be justified either as an adjunct to an injunction decree or as "an order appropriate and necessary to enforce compliance with the Act." 328 U.S. at 399–400, 66 S.Ct. at 1090.

The Commodity Exchange Act contains no provision similar to section 27 of the Securities Exchange Act, but neither does it have any provision restricting the equitable power of the district court. *Porter* and *Mitchell* indicate that the latter fact is a sufficient basis for concluding that a district court possesses the authority to order restitution pursuant to the Commodity Exchange Act. Further, as the Second Circuit noted in the Securities Exchange Act context, to allow a violator to retain the profits from his violations would frustrate the purposes of the regulatory scheme. *See SEC v. Texas Gulf Sulphur Co., supra,* at 1308; *SEC v. Manor Nursing Centers, Inc., supra,* at 1104. Thus we conclude that a district court may compel a violator of regulations promulgated under the trading limit provisions of the Commodity Exchange Act to disgorge his illegally obtained profits.

This conclusion, however, does not complete our inquiry. Both the district court's memorandum opinion and the Hunts' briefs refer to the complex evidentiary problems involved in the attempt to isolate the profits achieved by the Hunt family members on the basis of their soybean trading *in excess* of the speculative limits. Further, even if it can be determined with some precision what amounts should be disgorged, the Commodity Futures Trading Commission has made no suggestion about what a court would do with the disgorged funds. This is a particularly vexing problem given the difficulty of determining injured parties in a large, complex system of exchange like the soybean market. Therefore, we remand this issue to the district court to give the Commission the opportunity to present arguments and evidence regarding the feasibility of this form of remedy in the instant case.

### V. *Lower Court's Authority to Enjoin Publication of Hunts' Trading Positions*

On May 19, 1977 the district court entered an order preliminarily enjoining the Commodity Futures Trading Commission, in the absence of prior court approval, from making public the holdings, purchases, positions, or sales of the Hunts in the commodity futures market. The district court vacated this order on September 22, 1977. The Commodity Futures Trading Commission appealed the imposition of this order. We find that in light of the district court's removal of the injunction against publicity, the issue is moot.

■ Under Article III of the Constitution, the exercise of federal judicial power depends on the existence of a justiciable case or controversy; federal courts do not have jurisdiction to review moot cases. *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n. 3, 84 S.Ct. 391, 11 L.Ed.2d 347 (1964). In the instant case, the alleged injury suffered by the Commission because of the imposition of the injunction is no longer extant; the district court's order has expired. Further, this is not a case in which, because the issue is "capable of repetition, yet evading review," we should hold that the issue is not moot. *See Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Unlike the responding parties in these cases, the Hunts, especially given the imposition of an injunction supervising their trading, are unlikely to be involved in future litigation in which they seek to enjoin the Commission publicity about their commodity trading. *See also, e. g., Nader v. Volpe*, 154 U.S.App.D.C. 332, 475 F.2d 916 (1973). They do not have any significant interest in the question whether, in the future, a district court can impose a publicity injunction upon the Commodity Futures Trading Commission; thus, they lack the personal interest which stimulates adverseness. *See generally O'Shea v. Littleton*, 414 U.S. 488, 493–94, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). There is little likelihood that the Hunts will seek an injunction like this one in the future. Without such a likelihood of recurrence, the Southern Pacific Terminal doctrine does not apply and this controversy must be considered moot. *See SEC v. Medical Committee for Human Rights*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

## VI. *Dismissal of Counterclaims and Third-Party Claims*

■ The Hunts have cross-appealed from that portion of the district court's order which denied their counterclaims against the Commodity Futures Trading Commission and their third-party claims against Commissioner Bagley and unknown employees of the Commission for damages. These claims were based on the Commission's allegedly wrongful disclosure of the Hunt's soybean trading positions. The Commission published this information pursuant to section 8a(6) of the Commodity Exchange Act, 7 U.S.C. § 12a(6) (1976) which authorizes the Commission to publish "the full facts concerning any transaction or market operation, including the names of parties thereto, which in the judgment of the Commission disrupts or tends to disrupt any market or is otherwise harmful or against the best interests of producers and consumers." *Id.* We sustain the result reached in the lower court.

■ Without explicit authority, or unless the agency is the offspring of a suable entity, an agency of the federal government cannot be sued *eo nomine* for damages. *Blackmar v. Guerre*, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952). *See also Bell v. Groark*, 371 F.2d 202 (7th Cir. 1966). Congress did not write such authority into the Commodity Exchange Act. Thus, the Hunts' counterclaim against the Commodity Futures Trading Commission as an entity cannot be maintained.

■ The Hunts' third-party claims against Bagley and the unnamed employees of the Commission also fail. First, these parties were impleaded improperly by the Hunts. Fed.R.Civ.P. 14(a) authorizes the impleader of a person only when that person "is or may be liable to [the defendant] for all or part of the plaintiff's claim against him." Clearly the Commission employees who are the subject of the Hunts' third-party complaint are not liable for the Hunts' violation of the soybean trading limits. And this was the only claim brought by the plaintiff-Commission against the Hunts. Thus, Bagley and the unknown employees of the Commission cannot be brought before the court pursuant to Fed.R.Civ.P. 14(a).

■ More fundamentally, the Commission actions which are the substance of the Hunts' claims—publishing the Hunt family's positions in the soybean futures mar-

ket—were clearly within the scope of the official duties of Commissioner Bagley and the other Commission employees. *See* Commodity Exchange Act § 8a(6), 7 U.S.C. § 12a(6) (1976). Thus, the third-party defendants enjoy immunity from the Hunts' damage claims. *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Inst.*, 184 U.S.App.D.C. 397, 566 F.2d 289 (1977) (*en banc*).

Accordingly, we remand this case for further proceedings not inconsistent with this opinion.

MARKEY, Chief Judge, concurring and dissenting.

I concur in upholding Regulation 150.4, in affirming the declaratory judgment of a violation,[1] in holding moot the injunction-against-publication issue, and in affirming dismissal of the counterclaim and third-party claims.

I dissent, most respectfully, from reversal of the injunction denial, because it unjustifiably diminishes, if it does not disregard, the deference due the district judge's discretion.

I dissent, with equal respect, from remand of the disgorgement issue, because it wastefully compels a busy district judge to attempt the impossible.[2]

## I. *Refusal to Grant Injunction*

I would affirm the district court's refusal of an injunction.

The statute requires that the Commission make "a proper showing," and that showing must include "some reasonable likelihood of future violations."

The district court, who heard and observed the witnesses, who entered a carefully considered and reasoned Memorandum Opinion, and who supplied voluminous Findings and Conclusions, stated: "A 'proper showing' for preliminary injunctive relief under Section 6c of the Act requires the Commission to establish a *prima facie* case that there is a likelihood of *future* violations [emphasis the court's]. *No* such showing has been made." (emphasis added)

To order that a district court enjoin a party, when the other party has not made to that court even a *prima facie* showing of future violations, is to render merely platitudinous the majority's references to the district court's broad "discretion," and the concept that "injunctive relief is never automatic."

---

**1.** The "violation" is technical. The Commission conceded that defendants' trading had no effect on, and represented no threat to, the market. The evidence from which an "implied agreement or understanding" could be inferred is feeble. No intent to manipulate, or to aggregate, no "sinister" intent of any kind, was charged or shown. Defendants point to evidence of independent trading and the absence of an overall pattern. The district court, however, declared a violation on the basis of some instances reflecting non-exercise of independent judgment and the use of centralized reports. The question is not without doubt, but I cannot say that the district court's declaration was clearly erroneous.

I would add a dissent to the majority's discussion of what constitutes a violation. Even if, as the majority impermissibly does, one substitutes "acting in concert" for "acting pursuant to an * * * implied agreement or understanding," the need for inferring *some* scienter remains. Persons cannot act "in concert" without knowing it. To say that "nothing" in the act requires intent is to ignore the

statute's own words "agreement or understanding." Even if the majority's phrase be substituted, it is difficult to see how persons may be held to have acted "in concert" with no evidence of any intent to act in concert. Both the district court and the majority here, I respectfully submit, skate dangerously close to the thin ice, whereat a *post-hoc* aggregation equals violation. Absent *some* "understanding" the positions of any two or more traders could be "aggregated" and a "violation" be thereby found. Though the evidence here might well support a finding of no "agreement or understanding" of any kind, we do not sit *de novo,* and I agree with the majority in its deference to inferences drawn by the trial court. Fed.R.Civ.P. 52(a).

**2.** The Commission briefs on appeal make no argument in support of its request below for liquidation of excess holdings, perhaps because, as the district court stated in its Memorandum Opinion and Order of October 11, 1977, the aggregate holdings of the defendants "do not exceed the three million bushel limit."

The district court also found "no basis for a finding that the violations are likely to continue." Nowhere does the record reflect a basis for our declaring that finding clearly erroneous.

Importantly, the denial we here review is the *second* in this case. On May 6, 1977 the district court denied a preliminary injunction because the Commission had failed to make a "proper showing" therefor, even if defendants' positions were aggregated (*i. e.,* if there were a violation). The Commission appealed and *this court,* after briefs and argument, *affirmed* the refusal to grant the injunction, in an unpublished order of May 12, 1977. Nothing in the subsequent record adds any fact indicating a likelihood of future violation, or removes that affirmance from its standing as the law of the case.

In all events, this court should not reverse itself without at least some effort to distinguish its contradictory positions on the same facts.

The majority opinion lists various generalized bases on which an injunction *can* be rested, nowhere indicating, however, wherein the district judge *abused* his discretion in *this* case. Whatever may have been the relationship of the views expressed in the majority's cited cases to the facts in those cases (discussed below), no adequate foundation for application of those views appears in the record of this case.

If past misconduct be so suggestive of future violations as to require reversal, whence a reference to *any* "discretion" of a district judge? If past misconduct does not "necessarily" lead to a conclusion that future violations are likely, how can an appellate court rely on it to reverse *this* district judge's determination that it did not?

I find unhelpful a reference to "factors suggesting that the infraction might not have been an isolated occurrence," and "sys-

tematic wrongdoing," when no such "factors" are present or cited here. That reference is particularly inapt in this case, which the district court described as involving "the first clear cut application" of Rule 150.4 to family trading activity.[3]

That a defendant maintains his innocence, and refuses to cease blameless-in-his-eyes activities until a court declares him wrong, can hardly warrant an appellate court in substituting its judgment for every exercise of a district judge's discretion to deny an injunction, and in thus destroying all vestige of discretion and all right to an honest belief in one's own innocence sufficient to warrant a fight.

The facts must control. An honest belief in one's own innocence is one thing. A knowingly false claim of innocence is quite another. In this "first clear cut" case, defendants submitted extensive evidence indicating differences in trading patterns and lack of centralized trading control. All trades were fully reported on time to the Commission. Intent to aggregate or to manipulate was not shown and was not charged. Nothing whatever of record would justify a conclusion that defendants' assertion of innocence here was disingenuous, and the majority cites no basis for any such conclusion.

Similarly, it will not do to found a reversal here on the expectation that defendants will continue to trade. Whatever the facts may have warranted in *SEC v. Commonwealth Chemical Securities,* 574 F.2d 90 (2d Cir. 1978) (see *infra*), the rule is not whether the future violations "could be possible," but whether they are *likely.*

The majority labels the district judge's exercise of his discretion here as "anomalous," on the ground that a "violation" having been found, an injunction should have

---

**3.** In *Kent v. Hardin,* 425 F.2d 1346 (5th Cir. 1970), there was control by the father-in-law, and a letter expressing agreement to trade identically. Neither control nor express agreement is even alleged here, and neither was shown or inferable.

*United States v. Cohen,* 448 F.2d 1224 (2nd Cir. 1971), *cert. denied,* 405 U.S. 954, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972), was a criminal prosecution, in which a father totally controlled all trading, holding daily family meetings to instruct on strategy, placing and financing all trades personally, forging his sons' names, and keeping all funds in his own account. None of those acts occurred here.

been granted, again making injunctions automatic and effectively removing all discretion. In total contradistinction to the notion that a declaration of violation renders "anomalous" the denial of an injunction here, that declaration, sought by the Commission as a prophylactic, is, as the district court stated, a fully adequate *substitute* for an injunction in this case. *See Perez v. Ledesma*, 401 U.S. 82, 111–112, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (concurring opinion); 6A J. Moore § 57.05, 7 J. Moore § 65.18(2) n.4.

Nowhere showing the district judge's action to have been an *abuse* of discretion, but merely labeling it "incorrect," the majority opinion begins by calling defendants' conduct "carefully organized, large scale, and long term," and "systematic and preconceived." The district court did not so describe defendants' activities.[4] The nature of commodity trading futures contracts, the effect on the market of sudden liquidation, and an honest belief in blamelessness, fully justified carrying out the contracts under attack.[5] As above indicated, a defendant should not be penalized for an honest belief in his own innocence. The likelihood that defendants may participate is not the same as a likelihood that they will violate. Nor is capability for violation equatable with likelihood of violation; many are capable. That some offspring had not previously traded is equally meaningless; everyone who trades must start. The explication of the basis for reversing the district judge's exercise of discretion here would thus appear to be a gathering of zeros.

Further, the supplanting of the district court's discretion is occurring here: (1) without mention of the district court's carefully spelled-out reasoning, and without an explanation of why that reasoning is wrong; (2) without reference to or distinguishing of this court's earlier affirmance on the same facts; (3) without mention of defendants' having disposed (as found in the district court's order of October 11, 1977) of all their holdings above an aggregated total of 3,000,000 bushels; (4) without recognition of the immediate availability to the Commission of full information on all of defendants' future trades; (5) without guidance as to how defendants can be injunctively held to a total of 3,000,000 bushels, as the Commission insists, without centralized reports, one of the two bases for finding a violation here; and (6) without explanation of why an injunction is necessary to effectuate the manifest objectives of the legislation involved.

Still further, the authorities cited by the majority do not support reversal of the present injunction denial. They point toward affirmance. Of the eight cases cited, only two involved a reversal of a district judge's injunction denial, and the decision in those two cases rested on facts not present here.

Indeed, *United States v. W. T. Grant Co.*, 345 U.S. 629, 633–36, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953) virtually impels affirmance of the district court in the present case:

4. Use of pejoratives like "secret" or "clandestine" is precluded, because *defendants themselves* reported *all* of the their trading activities to the Commission, and it was *that* information which led to the Commission's complaint.

The pejoratives employed by the majority are not supported in the record. Far from "carefully organized," some offspring sold when fathers bought, some holdings never approached the limit, and the centralized reports were after-the-fact reports. Far from "large scale," defendants' total net long positions in soybeans was less than 2% of the total contracts. Far from "long term" the entire period involved is January-April 1977. There is no evidence whatever justifying "systematic" or "preconceived."

5. By letter dated April 14, 1977, the Commission notified defendants that their trading activities were aggregatable. At that time, the fathers, W. H. Hunt and N. B. Hunt, had each been at limit for eight months. The Commission filed its complaint in the district court on April 28, 1977. Trial began immediately. The majority's reference to "persistence" up to the day of trial seems at best inappropriate under those circumstances.

Moreover, the Commission's rush to the press, with disclosure of defendants' positions, and the consequent effect thereof on the market, virtually required completion of the existing contracts, and that completion was carried out *with permission of the district judge* who lifted a restraining order for that very purpose.

The facts relied upon by the Government to show an abuse of discretion in this case are these: Hancock's three interlocking directorates viewed as three distinct violations, his failure to terminate them until after suit was filed despite five years of administrative attempts to persuade him of their illegality, his express refusal to concede that the interlocks in question were illegal under the statute and his failure to promise not to commit similar violations in the future.

Were we sitting as a trial court, this showing might be persuasive. But the Government must demonstrate that there was no reasonable basis for the District Judge's decision.[7] In this we think it

7. *Cf. United States v. United States Gypsum Co.*, 340 U.S. 76, 89 [71 S.Ct. 160, 169, 95 L.Ed. 89] (1950), on review of particular antitrust decree provisions.

\* \* \* \*

fails. An individual proclivity to violate the statute need not be inferred from the fact that three violations where charged, particularly since it is only recently that the Government has attempted systematic enforcement of § 8. The District Court was not dealing with a defendant who follows one adjudicated violation with others. The only material before the District Judge on the supposed five years of administrative persuasion could easily support an inference that during that time the defendant and the Department of Justice were each trying to determine the legality of his directorships. The Government's remedy under the statute was plain. Postponement of suit indicates doubt on the prosecutor's part as much as intransigence on the defendant's. How much contrition should be expected of a defendant is hard for us to say. This surely is a question better addressed to the discretion of the trial court. The same can be said of the limited disclaimer of future intent.

Essentially, the Government's claim is that it was deprived of a trial on the relief issue. But at no time was objection raised to the procedure by which the case was handled. \* \* \* As to the prayer that the defendants be enjoined from any future violations of § 8, the complaint alleged no threatened violations other than those specifically charged. In these circumstances, the District Judge could decide that there was no significant threat of future violation and that there was no factual dispute about the existence of such a threat.

We conclude that, although the actions were not moot, no abuse of discretion has been demonstrated in the trial court's refusal to award injunctive relief. Moreover, the court stated its dismissals "would not be a bar to a new suit in case possible violations arise in the future."

The precedential and controlling impact of *Grant* is apparent. The bases for the charge (aggregation of family soybean contracts—viewing interlocking directorates as three violations) and the rejected reasons for reversing (continuation of existing contracts—failure to terminate directorships: maintenance of innocence—refusal to concede illegality) are virtually identical. As in *Grant*, the government here failed to demonstrate absence of reasonable basis for the district judge's decision. The "recently" attempted enforcement of § 8 in *Grant* parallels the "first clear cut application" of Regulation 150.4 in this case. The present defendants are not even accused of committing an "adjudicated violation." The amount of contrition to be expected of defendants here is just as "surely \* \* \* better addressed to the discretion of the trial court." Here, as in *Grant*, the government raised no objection to the procedure below and the complaint alleged no future violations other than those charged.

In *SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975), after pointing out that " \* \* \* illegal activity, without more, does not automatically justify the issuance of an injunction," *id.* at 807, the court affirmed issuance of an injunction against Levy and vacated that against Hodge, the difference being a clear showing of a "likelihood that the wrong will be repeated" in the one instance, *id.* at 807, and its absence, *id.* at 814, in the second.

In *SEC v. Bausch & Lomb, Inc.*, 565 F.2d 8 (2d Cir. 1977), the court *affirmed* the *denial* of an injunction, because the defendant's transgression was an isolated occurrence. In so doing, the court said, *id.* at 18–19:

It is well settled that the Commission cannot obtain relief without positive proof of a reasonable likelihood that past wrongdoing will recur. [Citing cases.] * * * The SEC must show a "cognizable risk of future violation, something 'more than the mere possibility which serves to keep the case alive.'" [Citing cases.] * * * As the party challenging the district judge's exercise of discretion, the SEC can prevail only if there was no reasonable basis for his decision. [Citing cases.] In this case, the SEC has utterly failed to make such a showing.

\* \* \* \*

* * * This court is not inclined to substitute its judgment for that of the experienced trial judge who heard the witnesses and had the "opportunity by observation better to prophecy future conduct than we can on this printed record." *Chris-Craft Industries v. Piper Aircraft Corp.*, 480 F.2d 341 (2d Cir. 1972).[6]

In *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974), the court *affirmed* the imposition of an injunction against a stock market professional who used corporate insider information on seven stock purchases within six weeks, stating " * * * we do not review the decision ·of the district court de novo." *Id.* at 1308.

Again, in *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), the court *affirmed* the issuance of an injunction against defendants who had engaged in repeated acts of *fraud* described by the district judge as "willful, blatant, and often completely outrageous," *id.* at 1101, and the conflict and inconsistency of defendants'

testimony justified the district judge's doubts about assurances of no future violations.

In *SEC v. Commonwealth Chemical Securities, Inc., supra*, the court affirmed the issuance of an injunction against defendants guilty of "repeated and persistent," 574 F.2d at 100, acts of *fraud*, and vacated injunctions against other defendants, saying "we see no likelihood of repetition," *id.* at 100, adding: "It would make a mockery of language such as that we have recently used in *Bausch & Lomb* [*supra*] to hold that the SEC had met its burden of showing a likelihood of recurrence with respect to these two minor participants concerning whom there was no evidence of prior or subsequent violations." *Id.* at 100. The court also said, "It is fair to say that the current judicial attitude toward the issuance of injunctions on the basis of past violations at the SEC's request has become more circumspect than in earlier days." *Id.* at 99. After pointing out that injunctions can have grave consequences, the court said, "Our recent decisions have emphasized, perhaps more than older ones, the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence. [Citing cases.]"[7]

One such "older" case, *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40 (2d Cir. 1972), is one of the two cited in which an injunction denial was reversed. Defendants knowingly made false statements and omissions in reports and breached fiduciary relationships. The court said, "These were not mere 'technical' violations of regulatory legislation, but continual and extensive violations of provisions which lie at the very heart of a remedial statute." *Id.* at 53–54. In our present case: there are no false statements, omissions, or fiduciary breaches; the violation *is* of "regulatory legislation;" and there is no charge or evidence of

---

**6.** Compare the present case, where the violation is an isolated "first," the Commission made *no* showing, and the proposal is to substitute the panel's judgment for that of a most experienced trial judge.

**7.** Compare our present case, where the district judge found that the Commission made *no* showing, not even *prima facie*, of *any* likelihood, much less a "realistic likelihood," of recurrence.

market manipulation, which "lie[s] at the very heart of a remedial statute."

*Commodity Futures Trading Commission v. British American Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977), is the other case involving reversal of an injunction denial, and the only cited case involving the present Commission. There the violation was of a statutory requirement for registration, 7 U.S.C. § 6m, entirely different from the regulation here involved. There, also, the decisional matrix was comprised of facts entirely distinct from those now before us. Defendant acted as a commodity trading advisor without being registered. The court, like that in *Advance Growth*, noted the relationship to the statute, describing registration as "the kingpin in this statutory machinery." 560 F.2d at 139. The Commission filed an administrative complaint, citing the prior SEC disbarment of defendant's president and sole stockholder, John Forma, from the securities markets, and current *defrauding* by defendant of commodity option buyers, as grounds for denying defendant a registration. When defendant continued its activities for three months thereafter without registration, the Commission sued in court for only a preliminary injunction.[8] The district court denied an injunction in the belief that a likelihood of some fraud or misconduct related to John Forma's securities law violations must be shown. Pointing out that the injunction merely precluded use of the mails without registration, and that fraud and misconduct of John Forma were not required when the statute merely required *registration of defendant*, the court held the Commission *had* established a *prima facie* case that *unregistered* activities were likely of repetition, stating, *id.* at 144:

> We do not hold here that the district court must become a rubber stamp and issue an injunction whenever the Commission applies for one. We hold simply that once the Commission has made a

prima facie showing that violations of the registration provisions of the Act have occurred and are likely of repetition and that the Commission has a tenable basis for commencing administrative proceedings to inquire into an applicant's fitness, an injunction must issue.

We share the district court's concern and unfavorable view of the Commission's delay at the administrative level, and appreciate the difficulties confronting it in undertaking to resolve the elusive and irrelevant issues raised at the hearing. Nevertheless, we feel that the Commission, albeit confusingly, made out a "proper showing" for relief under § 13a–1, and the injunction should, therefore, have been issued.

The issue here, as I view it, is not whether the district judge *could* have granted an injunction, but whether he *had* to; not whether he "incorrectly" exercised his discretion, but whether he *abused* it.

In the total absence of any showing of a likelihood of future violations, the district judge would have abused his discretion if he *had* granted the injunction.

The majority opinion reflects broad statements which, if all were applicable here, and if we were considering the matter de novo, might arguably support the grant of an injunction. But we do not sit de novo. There has been a trial, with full opportunity for the Commission to make its case for an injunction. The district judge heard and observed the demeanor of all the witnesses. Where, as here, an executive agency is found by the district court to have made "*no* showing" (emphasis added), not even prima facie, that future violations are likely, it ill behooves an appellate court to create that showing. In all events, I respectfully suggest that a showing, not merely prima facie but so strong as to require reversal, cannot be constructed on innuendo and speculation drawn from the present printed record.

---

8. Unlike the situation here, where the Commission filed no administrative complaint prior to suit, but sought a full panoply of relief from the courts, filing an administrative complaint only *after* the final order of the district court and on the same facts and allegations then pending on appeal before this court. See our decision of even date in appeal no. 78–1055 (Hunt II), 7th Cir., 591 F.2d 1234.

In respect for the district judge's carefully considered exercise of his discretion, in consideration of his having heard and observed all the witnesses, in the light of the Commission's total failure on appeal to show that the district judge had no reasonable basis for his exercise of discretion in this case, and, above all else, in recognition of his effectively unchallenged finding that the Commission made no showing before him that future violations were likely, as required by law, I would affirm the district judge's denial of an injunction.

II. *Lower Court's Denial of Commission's Request for Disgorgement*

Concerning the Commission's request for an order directing disgorgement, the district court said this:

No statutory authority for this dramatic prayer for relief is cited. Further, the evidence of the shifting positions of the Hunts in the market, and the complexity of the evidence relevant to individual responsibility for exceeding position limits when the family holdings are aggregated, make it *impossible* to fashion a formula by which the profits to be disgorged by the individual defendants could be determined with any measure of equity. [Emphasis added.]

On appeal, the Commission makes no effort to counter the district judge's finding that an equitable disgorgement formula was impossible. Its only reference thereto is in a footnote, alleging that denial of that remedy was premature and that it had had "no opportunity" to "present [unspecified] information." As discussed below, that statement is at best disingenuous.

The majority opinion chooses to substitute for the district court's equitably *"impossible"* evaluation its description of "merely complex evidentiary problems" in isolating profits and the merely "vexing" problem of determining injured parties.

A short litany of market facts demonstrates the correctness of the district court's "impossible" evaluation and the inaccuracy of the attempted downgrading to merely "complex-vexing:"

(1) Defendants' activities concededly had no effect on the price of soybeans.

(2) Increase or decrease in position value is settled daily.

(3) Profitability of "naked" positions differs from profitability (if any) of "spread" positions.

(4) Futures contracts are fungible, i. e., it is impossible to determine which contracts are being sold when less than the entire position is sold.

(5) A trader's account reflects only net increases or decreases in all commodities combined where a trader trades in more than one commodity.

(6) Which parts of a long position are "spread" against a short position is impossible to determine.

(7) A commodity future contract fluctuates almost daily in price and traders can take any profit out of the accounts immediately, making tracing impossible.

(8) Delivery wipes out all profits made in a position.

(9) Only the profits on excess holdings are sought to be disgorged, adding to the impossibility of tracing, valuation, cross-account segregation and contract identity described above.

(10) Here there are eight defendants trading in various commodity futures at various times, "trading the crush," trading the "reverse crush," going long, spreading, "rolling," "covering," going short, and "passing through," all relating to commodities that don't yet exist and are likely never to be delivered to any trader holding a contract during the period (January-April) involved in the complaint.

Even if disgorgement were appropriate here (and, I submit *infra*, it is not) the job of tracing, identification, and valuation would embroil the district court in evidentiary problems of complexity unlimited and of chaos unending. Even then, as the district court so clearly stated, the working out of an *equitable* formula would be *impossible*.

Appellate courts should not, I think, order a district court to attempt the achievement of what the district court sees, and what upon short reflection all can see, from the outset to be impossible.[9]

Moreover, we should not order an attempt to do a useless thing. Presumably, disgorgement is limited to what the majority calls "illegally obtained profits," i. e., the profit made from the fact that defendants held, for a few days between January and April 1977, a total soybean position exceeding 3,000,000 bushels. But, as the record makes clear, there *were no such profits.* Nor could there be. After a trial involving fourteen live witnesses, 125 multi-page exhibits, and some 30 depositions, there is not even a Commission suggestion that any defendant sold any contract at a price made higher because the defendants' total positions exceeded 3,000,000 bushels.

On the contrary, the Commission admitted, during the May hearings, that defendants' activities had no effect on the market. Thus each of defendants' sales must be presumed to have been made at the same (unaffected) market price at which it would have been made if the total positions had been equal to or less than 3,000,000 bushels. Absence of profits does not preclude declaration of a violation, but it would appear (if, as the majority says, disgorgement is remedial, not punitive) to preclude a requirement to disgorge what is not there.

In *SEC v. Manor Nursing Centers,* 458 F.2d at 1104–05, the court affirmed an order to disgorge proceeds from a fraudulent stock offering. It *reversed* an order to disgorge the profits made on those proceeds, because that order was not remedial relief to the stock purchasers, quoting *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir. 1971) for the proposition that investors are "entitled to recover only the excess of what [they] paid over the value of what [they] got." In the present case there is not the slightest evidence that any investors anywhere paid anything "over what they got" as a result of defendants' non-fraudulent violation. Nor does the Commission favor us with any indication of the nature or availability of any such evidence.

It must be remembered that *defendants* did not "aggregate" their holdings. The Regulation requires that holdings be aggregated *after* an "agreement or understanding" is found or inferred. A different situation would arise if a group, pursuant to an agreement, combined their holdings and *thereby* increased the value thereof, or otherwise profited *from* the combination. Absent that circumstance, there simply are no "illegally" obtained profits to be disgorged.

Even if there were illegally obtained profits, and if it were possible to devise an equitable formula, and if the district court had nothing else to do, I would remain unable to find a basis for an order to disgorge in this case.

The Commission's attorneys tell us that the Commission "moved only for a preliminary injunction" below, and that it made "no request for disgorgement and no argument on the propriety of that relief." The majority opinion, accepting that statement, begins with "no hearing on the merits of the propriety of this relief was held in the trial court" and with a characterization of the district judge's denial of the disgorgement prayer as "precipitous." That characterization is, I submit, and not to put too fine a point upon it, simply unfair to the district court.

About the trial below, the Commission's attorneys told its ALJ, in its concurrent administrative proceeding:

> The order of the District Court in the matter of the CFTC v. N. B. Hunt, et al., (77 C 1489) satisfies this test. After the District Court Denied the Commission's original motion for a preliminary injunction, the matter was set for trial. Extensive discovery was conducted by both parties. Several days of testimony was heard by the Court in both June and July

---

**9.** The majority opinion defers to the inference of a violation drawn by the district court, but disregards the same court's unequivocal statement (not merely an inference) that devising an equitable formula is impossible.

of 1977. Findings were proposed by both sides, briefs submitted, *and a final decision rendered. In short, both the CFTC and respondents were accorded a full opportunity for an adversary hearing.* Additionally, the District Court ruling is a *final order* for purposes of appeal; it carries the label of a final order; *it disposes of all of the claims between parties*; jurisdiction has passed from the District Court to the Court of Appeals; *and the nature of the proceedings was such that the District Court had jurisdiction to render a final decision on the issues.* [Emphasis added.]

At no time did the Commission lack opportunity to press for the disgorgement remedy it specifically sought and separately emphasized in its complaint. The prayer for disgorgement was present throughout the trial and figured prominently in the district court's Memorandum Opinion and Order. Just as in *Grant,* the present Commission waited until it got here to complain "that it was deprived of a trial on the relief issue," and, as in *Grant,* "at no time was objection raised to the procedure by which the case was handled." If the Commission here was "deprived," who deprived it? Certainly not the district court. If the Commission had any objection to the procedure below, why was it not made below? In sum, where was there reversible error on the part of the district court?

It is not, of course, the function of an appellate court to encourage piecemeal litigation, or to provide a second opportunity to a litigant who waits until the appeal to merely say it had not argued for one of the remedies it sought in its complaint, or to a litigant who makes no showing of any additional evidence submittable on remand, or, particularly to a litigant who insists, to its advantage in another tribunal, that it had been accorded by the district court here, "a full opportunity for an adversary hearing" and had received a final order which "disposes of all the claims between the parties."

In all events, it would appear that under the circumstances a characterization of the district court's denial of disgorgement as "precipitous" is at best inappropriate.

The remainder of the majority opinion on this issue is devoted to the "close" question of whether disgorgement is a permissible remedy for violation of the Commodity Exchange Act. The absence of the remedy from the statute is met by reliance on the general equity powers of the courts (and silence in the Act regarding them), and on analogies drawn to the Securities Exchange Act and the Emergency Price Control Act. Because I believe disgorgement totally inappropriate in this case, I would await an appeal from a judgment in which the remedy was applied to discuss these questions.

For the moment, I would offer two caveats. The Commission argued in the May hearings below that Congress gave the Commission access to the courts where a violation was causing an emergency remediable only by injunction. If that be so, there is no basis in law for disgorgement here. Further, Congress' failure to provide the remedy may well lie in the impossibility of its application.[10] Securities and price controls relate to things in existence and to specific, individual dealings, having to do with a stock, a bond, or a prospectus, or the price of a specific product or products. Hence, both the amount of "profit" and the person or persons to whom retribution is owed may be determined in most cases with relative ease. The law of commodity futures contracts, as above indicated, deals with "contracts" on commodities not yet harvested or processed and from no specific farm or orchard. Decisions are made daily, to buy, sell, go "long" or "short" etc., etc., solely on the investor's estimate of what the market price of a particular commodity will be in the *future.* "Buyers" of "contracts" on specific future deliveries are normally unknown to "sellers" of those particular "contracts," and vice versa. The involved commodities may not be, and rarely if ever are, delivered to the personal possession of

10. That fact may also account for Congress' provision of criminal sanctions and fines of $100,000 for each day on which a violation continues. 7 U.S.C. §§ 9 and 13(b), (c) (1976).

the investor-speculator. Disgorgement of what and to whom is thus, as the district court stated, equitably impossible.

Even if the district court had granted the remedy, and the impossibility of its equitable application had first appeared on the appeal, this court would have been warranted in reversing that grant. As was said by the Court in *Meccano, Ltd. v. John Wanamaker*, 253 U.S. 136, at 141, 40 S.Ct. 463, at 465, 64 L.Ed. 822 (1920): "[I]f insuperable objection to maintaining the bill clearly appears, it may be dismissed and the litigation terminated."

Coming full circle, I would affirm the district judge's denial of the disgorgement remedy, (1) because the Commission had full opportunity to, and did, submit all of its evidence of defendants' activities, making no objection to the procedure below, and (2) because the district judge's finding of the impossibility of equitable application has not been shown to have been clearly erroneous.