**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**CO PETRO MARKETING GROUP, INC., a California Corporation; Harold D. Goldstein; Daniel Goldstein; Michael Bradley Krivacek; Richard Hindley; Jesse Lama; Dillon, Chase, West, Inc., a California Corporation; John Morris; Lawrence, Collins & Wexler, Inc., a California Corporation; John P. Collins; Anglo-American, Ltd., an Arizona Corporation; Neville Carter; and Energy Investment Exchange, Inc., a California Corporation, Defendants.**

**No. CV 80-1109-RJK.**

United States District Court, C. D. California.

May 7, 1980.

Gregory C. Glynn, Associate Gen. Counsel, Commodity Futures Trading Commission, Washington, D. C., Howard Gest, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff.

Anthony Murray, Brian Cuff, Ball, Hunt, Hart, Brown & Baerwitz, Long Beach, Cal., Frank E. Merideth, Jr., Loo, Merideth & McMillan, Los Angeles, Cal., Edmund R. Davis, Overton, Lyman & Prince, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

## I. INTRODUCTION

This is an action brought by the Commodity Futures Trading Commission against Co

Petro Marketing Group, Inc., and its various employees and sales agents, charging violations of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, as amended by the Futures Trading Act of 1978, Public Law 95–405. The Court has subject matter jurisdiction over this action pursuant to 7 U.S.C. § 13a–1. Plaintiff's complaint charges that defendants violated Sections 4 and 4h of the Act, 7 U.S.C. §§ 6 and 6h, which, in general, prohibit any person from soliciting or executing any contracts for the purchase or sale of any commodity for future delivery, or from quoting the price of any such contract, unless the contract is made by or through a designated contract market.

On March 21, 1980, the Court issued a Temporary Restraining Order enjoining defendants from offering to enter into, or entering into, any commodity futures contract within the meaning of 7 U.S.C. §§ 6 and 6h. The hearing on plaintiff's application for a preliminary injunction was set for April 2, 1980, and the parties stipulated that the temporary restraining order would continue in force until that date. On April 2, upon agreement of the parties and pursuant to Fed.R.Civ.P. 65(a)(2), the Court ordered the trial of this action on the merits advanced and consolidated with the hearing of plaintiff's application for a preliminary injunction. At the conclusion of this hearing, the Court ordered the parties to file further memoranda and took the matter under submission as of April 21, 1980. Pursuant to stipulation of the parties, the temporary restraining order issued by the Court on March 21 was to remain in effect until April 30, 1980 at 5:00 p.m. Thereafter, the parties again stipulated to extend the restraining order until May 7, 1980 at 5:00 p.m.

On April 2, 1980, pursuant to the stipulation of the parties, the Court granted the following preliminary injunction against defendants Dillon, Chase, West, Inc., John Morris, Anglo American, Ltd., Neville Carter, Lawrence, Collins & Wexler, John P. Collins, Jesse Lama, Richard Hindley, and all persons acting in concert with them. These defendants were restrained from "selling, offering to sell, purchasing or offering to purchase, or dealing in any manner with the 'cash forward delivery contract' of Co Petro Marketing Group, Inc., or any other contract for the forward delivery of petroleum products of the type alleged in the Complaint herein, pursuant to Plaintiff's acceptance of these Defendants' offer of judgment which is before the Court." This injunction was not directed to defendants Co Petro Marketing Group, Inc., Harold D. Goldstein, Daniel Goldstein, and Michael Bradley Krivacek.

On April 16, plaintiff filed a "Memorandum of Points and Authorities on Relevancy of Prior Acts of Defendant Harold Goldstein." In response, on April 16, defendants Co Petro and Krivacek filed a memorandum of points and authorities in "Opposition to Admission of Proffered Evidence." On April 16, defendant Harold Goldstein also filed a memorandum of points and authorities in opposition to plaintiff's request for judicial notice. In addition, on April 10, plaintiff filed the "second declarations" of Douglas L. Campbell and Daniel A. Driscoll. In response, defendants Co Petro and Harold Goldstein filed "Defendants' Response to the Second Declarations of Douglas L. Campbell and Daniel A. Driscoll." Defendants Harold Goldstein and Co Petro also joined defendant Krivacek in filing an additional memorandum in response to the additional Campbell and Driscoll declarations. On April 21, 1980, plaintiff filed a reply to defendants' "Opposition to Admission of Proffered Evidence." Defendant Daniel Goldstein joins in defendants' various responses.

## II. ISSUES PRESENTED AND FACTUAL BACKGROUND

The issues presented for determination by the Court here are: (1) whether the transactions engaged in by defendants constitute a contract for the purchase or sale of a commodity for future delivery–namely, a commodity futures contract–which must be executed or traded on a contract market designated pursuant to 7 U.S.C. § 1 *et seq.*;

or whether such transactions are merely "sale[s] of [a] cash commodity for deferred shipment or delivery," which are excluded from the coverage of 7 U.S.C. § 1 et seq.; and (2) if violations of 7 U.S.C. §§ 6 or 6h are found, what kind of relief should the Court grant.

Co Petro Marketing Group, Inc., is a California corporation which is engaged in the purchase and sale of various petroleum products. This business has several facets. First, defendant Co Petro sells gasoline directly to industrial, commercial, and retail users. As a part of these operations, Co Petro participates as a gasoline broker in the spot market. Second, Co Petro offers what it terms a "cash forward contract" for the purchase of gasoline. Briefly, this "cash forward contract" operates as follows. The buyer appoints Co Petro as agent to use its best efforts to purchase a given quantity and type of gasoline at a fixed price for delivery at a future, agreed–upon date. At the time the contract is executed, the buyer remits to Co Petro some percentage of the total purchase price as determined by Co Petro. Thereafter, the buyer must notify Co Petro by a certain date either: (a) that the buyer will make payment of the balance of the purchase price and will take actual delivery of the fuel within ten days after Co Petro advises the buyer that the fuel is available for delivery; or (b) that the buyer does not wish to take delivery, but, instead, requests Co Petro to enter into the spot market and resell the fuel on the buyer's behalf; the person to whom the fuel is resold pays the then–current spot price for the gasoline, and Co Petro remits to the original purchaser the difference between the price at which the first purchaser agreed to buy the gasoline and the spot price paid by the subsequent purchaser. Finally, the "cash forward contract" provides for an amount in liquidated damages should either the buyer or Co Petro decide to cancel the contract.

Defendants Krivacek and Harold Goldstein served as officers of defendant Co Petro from the time of its inception in July of 1979. Harold Goldstein resigned from his position as a corporate officer as of March 20, 1980. Krivacek, Harold Goldstein, and Daniel Goldstein serve as Co Petro's board of directors. At least since November, 1979, Harold Goldstein has owned one hundred percent of the stock of Co Petro.

### III. "FUTURES CONTRACT" VERSUS "SALE OF CASH COMMODITY FOR FUTURE DELIVERY"

The gist of plaintiff's claim is that defendants' "cash forward contract" is actually a disguised commodity futures contract which is being executed outside of a proper contract market, in violation of 7 U.S.C. §§ 6 and 6h. Defendants, on the other hand, claim that their contract is merely one for the sale of a "cash commodity for deferred shipment or delivery," which is expressly excluded from regulation under the Commodity Exchange Act, as amended, 7 U.S.C. § 1 et seq. Resolution of this issue requires a careful parsing of the language and legislative history of this statute.

7 U.S.C. § 2 vests plaintiff Commodity Futures Trading Commission with exclusive jurisdiction with respect to "transactions involving contracts of sale of a commodity for future delivery, traded or executed on a contract market designated pursuant to section 7 of this title or any other board of trade, exchange, or market ...." However, § 2 further provides that "[t]he term 'future delivery' as used in this chapter, shall not include any sale of any cash commodity for deferred shipment or delivery." 7 U.S.C. § 6 makes it unlawful for any person to use the mails or any other instrumentality of interstate commerce to *offer to make* or *execute*, or any *confirmation of the execution* of, or any *quotation* or *report of the price* of, *any contract of sale of commodity for future delivery* on or subject to the rules of any board of trade in the United States, or for any person to make or execute such sale, which is or may be used for (a) hedging any transaction in interstate commerce in commodity or the products or byproducts thereof, or (b) determining the price basis of any such transaction in inter-

state commerce, or (c) delivering the commodity sold, shipped, or received in interstate commerce for the fulfillment thereof, *except ... where such contract is made by or through a member of a board of trade which has been designated by the Commissioner as a 'contract market' ....*" [emphasis supplied.] 7 U.S.C. § 6h prohibits any person from "*soliciting* or *accepting any orders* for the *purchase or sale of any commodity for future delivery*, or [from] making or offering *to make any contracts for the purchase or sale of any commodity for future delivery*," or from conducting any dealings in commodities for future delivery that may be used for hedging any transaction in interstate commerce in such commodity, determining the price basis of any such transaction, or delivering any such commodity sold, shipped, or received in interstate commerce in fulfillment thereof, "*if such orders, contracts, or dealings are executed or consummated otherwise than by or through a member of a contract market [.]*" [emphasis supplied.]

Thus, the existence both of the power of plaintiff to pursue this action and of violations of the substantive prohibitions under 7 U.S.C. §§ 6 and 6h depend upon a finding that defendants' transactions are "futures contracts," as opposed to "sales of a cash commodity for deferred delivery." The exact nature of the distinction between these two types of contracts seems to present a rather novel question. Neither party is able to cite any case law which delineates this distinction. Accordingly, the Court must return to the legislative history of the Commodity Exchange Act to examine the underlying rationale for the exclusion of "sales of cash commodities for deferred delivery" from the general aegis of regulation of "commodity futures contracts."

■ This exclusion originated in the Future Trading Act of 1921, 42 Stat. 187, and was incorporated into the Grain Futures Act of 1922, 42 Stat. 998, the predecessor of the Commodity Exchange Act, whose interpretation is at issue here. As the following colloquies from the congressional hearings and floor debates indicate, the exclusion for "sales of cash commodities for deferred delivery" was included solely to enable a farmer to sell his grain to the elevator without routing such a transaction through a contract market operated by a board of trade. The relevant portions of the legislative debate over the amendment are reproduced more fully in the attached Appendix. However, the following key passages provide useful insights into the underlying intent of the exclusion.

As Sen. Capper, a proponent of the Senate version of the Futures Trading Act, explained:

"The amendment [adding the language: "The term 'future delivery' as used herein shall not be held to include any sale of cash grain for deferred shipment."] was put in by the House Committee, as I understand, toward the close of the hearings, on the assumption that unless those words were in it would interfere with a man *selling his own grain*. If you want to be entirely sure that this bill does not affect cash transactions, the amendment ... will clear up that doubt ...." [emphasis supplied.]

*Hearings on Futures Trading in Grain*, Senate Committee on Agriculture and Forestry, 67th Cong., 1st Sess., 461–463 (1921). Later, during the Senate Floor debate over the legislation, Sen. Capper emphasized:

[T]hese evils ... all grow out of dealings in futures. The bill does not touch any transaction in cash grain, for it is expressly provided in the definition section that it shall not include any cash grain for deferred shipment. * * * Let me repeat that the bill does not concern itself at all with the sale or purchase of *actual grain*, either for present or future delivery. The entire business of buying and selling the *actual grain*, sometimes called 'cash' or 'spot' business, is expressly excluded. It deals only with the 'future' or 'pit' transaction in which the *transfer of actual grain is not contemplated*."

61 *Cong.Rec.* 4762, 67th Cong., 1st Sess., August 9, 1921.

■ Thus, examination of the original reasoning behind the exclusion of "cash

commodities" from the scheme of commodity futures regulation indicates that the exclusion was intended to apply only to those contracts for sale which are predicated upon the expectation that delivery of the *actual* commodity by the seller will in fact occur. *See In Re Stovall, et al., Commodity Futures Law Reports,* 23,775 at 23,777 (Commodity Futures Trading Commission, CFTC Docket No. 75–7, December 6, 1979). The "cash grain" exclusion was directed to the transactions between a farmer and either a grain elevator or mill, and as such, was based upon the assumption that the purchaser would have the capacity to accept *actual* delivery of the commodity in performance of the contract and that the seller would have the capacity to make such a delivery.

This view finds support in the House Committee Report No. 93–975, accompanying the 1974 legislation which created the Commission, reproduced in *Commodity Futures Law Reports,* 1047 at 1047–1048. The Committee Report gives the following example of a cash transaction. A prospective seller owning a commodity, such as a farmer owning 5,000 bushels of wheat, wants to convert it to cash. Consequently, he seeks as a buyer "someone for whom the wheat has inherent value. The wheat has value for the grain elevator because he is in contact with potential buyers, such as the flour miller, and has the facilities to store, condition, and load out the grain and earn additional income from these services. The wheat has value for the flour miller, in turn, who is able to increase its value and utility by grinding it to flour for the baker." The Committee Report further explains that "[a] cash contract in which the merchandise is not to be delivered immediately, but on an agreed upon future date, is known as a cash forward contract. * * * By using a cash forward contract, the miller would be guaranteed a price but could defer the delivery until such time as he could process the wheat. A cash forward contract enables the buyer and the seller of commodities to properly plan for and utilize both storage and production facilities and to make commitments for deferred deliveries

of the commodity or of further–processed products." The Committee Report further notes that a cash forward seller of a commodity might not even have the commodity at the time the contract is entered into, but contracts with the good faith belief that he can acquire the commodity in time to deliver. This situation is really no different from the farmer who contracts with the elevator well in advance of the actual harvest. In short, then, the 1974 House Committee Report buttresses the conclusion that the "cash commodities" exclusion–indeed even the "cash forward contract" notion which defendants seek to invoke here–presupposes that *actual, physical delivery* of the commodity will take place from the original seller to the original buyer in fulfillment of the contract.

■ The House Committee Report defines a "futures contract" as a legally binding commitment to deliver or take delivery of a given quantity and quality of a commodity, at a price agreed upon when the contract is made, with the delivery date being at the seller's option sometime during the specified future delivery month. *Commodity Futures Law Reporter, supra,* 1047 at 1048. Such futures contracts are undertaken generally as a means of assuming or shifting the risk of a change in price of a commodity, rather than as a means for transferring ownership of the actual commodity. A futures contract may be satisfied either by an opposite and offsetting transaction in the same future prior to the delivery date or by delivery of the specified quantity of the commodity by the seller to the purchaser during the specified delivery month, with payment due upon delivery. However, as the Eighth Circuit observed in a footnote, "As a matter of reality and practice rarely does a future commodity dealer actually intend to take or make delivery on that commodity. Commentators estimate it to be less than 1 percent." *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1156 n.2 (8th Cir. 1971), *cert. denied, sub nom, Cargill, Inc. v. Butz,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972). By engaging in an opposite, offsetting transaction, the specu-

lator receives a profit or loss, depending on the difference between the respective prices of the commodity in the initial and offsetting transactions.

In the face of this analysis, the distinction drawn by the Commission in *Stovall* seems persuasive:

"Thus, a major difference between an excluded cash commodity–deferred delivery contract and contracts of sale of a commodity for future delivery is that the former entails not only the legal obligation to perform, but also the *generally fulfilled expectation that the contract will lead to the exchange of commodities for money.* In contrast, parties to a futures contract do not usually expect delivery and it rarely occurs."

*Commodity Futures Law Reports*, 23,775 at 23,778.

In seeking to distinguish their contracts from futures contracts, Co Petro maintains that delivery of the fuel is always contemplated by both the buyer and Co Petro, and such delivery in fact occurs to close out the transaction. Thus, some purchaser of the gasoline may ultimately take delivery, just as bread manufacturers may ultimately take delivery on a wheat futures contract which has been traded among a number of hands. However, the important point here is that a significant portion of the original purchasers of Co Petro's contracts for later delivery of gasoline are merely investors from the general public who *never* intend to take delivery of the tankloads of gasoline under *any* circumstance–regardless of whether the spot price in the future has increased, providing a profit on resale, or decreased, providing a loss. This conclusion necessarily flows from the type of salespeople and salespitch employed, and customers sought, by Co Petro.

To market its gasoline contracts, Co Petro sought salespeople experienced in selling investment vehicles to the public. This theme is obvious from the kinds of newspaper employment advertisements which Co Petro used. For instance, Co Petro placed the following advertisement in the *Los Angeles Times*: "SALES/INVESTMENTS.

If you have the investment sales background to make big commissions in Vehicles such as opts [presumably commodity options], metals, etc. * * * Call today, 213/386–1025 [Co Petro's phone number as set forth on various invoices submitted to the Commission and on its "Redemption Certificates" for five gallons of gas used as a promotion tool.] *Los Angeles Times*, August 19, 1979, Part III p. 9. In addition, the nature of the qualifications of the salesmen who were to sell Co Petro's investment contracts is also revealing. At his deposition, John Morris, an officer of Dillon, Chase, West, Inc., a sales agent for Co Petro contracts, responded as follows to questions from a Commission investigator:

"Q What factors qualify him [to sell Co Petro gasoline contracts]?

A If he sold other commodities to investors.

* * * * * *

Q So we are talking about commodity contracts or articles that might be traded through public exchanges?

A Mutual funds, stock markets, investments of one type of–or another."

Co Petro's efforts to market its gasoline contracts through its sales agents clearly focussed in large part on investors from the general public. At his deposition, John Patrick Collins of Lawrence, Collins & Wexler, Inc., described how his firm marketed gasoline contracts on Co Petro's behalf:

"[Collins:] I like qualified investor clients. And I purchase lead lists of investors.

Q From whom do you purchase the lead lists?

A Investors, or there is several local– We have got two different ones. One is a lead list from a man named Goforth in Modesto. It shows miscellaneous investors' income on oil, gas, cotton, real estate. It shows the amount they invested, and so forth. Also, we have used the business directory showing the phone numbers and officers of various companies. * * * We called financially–qualified people, what we feel are financially–qualified people."

Morris of Dillon, Chase, West, Inc., in fact admitted that the Co Petro contracts were offered to investors who clearly would not take actual delivery of bulk supplies of gasoline. After Morris stated that a "significant number" of the leads his firm pursued in marketing the Co Petro contracts were retail gasoline stations or bulk end–users with storage facilities, the following colloquy occurred:

"Q What if the answer to what his storage capacity is [is] zero? Is he dropped as a lead?

A No. We explain to him that he has an opportunity to purchase gasoline for delivery or sale at some subsequent date.

Q So that doesn't cut him off, the fact that he doesn't have storage capacity? He's still a prospective customer?

A Yes.

Q In my definition of speculation, a speculator ... is ... a person who does not have the storage capability, who is not interested in obtaining the physical product, who merely wants to, if you will, take a flier that his gasoline is going to go up, that in and of itself does not disqualify him from your continued solicitation to purchase this type of contract? Is that correct?

A No, it does not."

Indeed, rather than disqualifying such private investors who were not bulk users, Co Petro directed its sales pitch and marketing campaign for the gasoline contracts at precisely such a group. For instance, in an advertisement in the *Los Angeles Times* under the headline "Invest in Gasoline," Co Petro stated: *"The Sophisticated Small Investor Can Make Money Buying Gasoline.* * * * It's a high risk–high potential yield opportunity. * * *" *Los Angeles Times*, January 8, 1980, Part IV, p. 15. [emphasis in original.] In promotional material provided to the Commission, Co Petro stated: "We are able to offer gasoline in bulk lots small enough for the average end–user or *speculator* to purchase." [emphasis supplied.] This reference to "small bulk lots" is clearly intended to mean that such an investment is accessible to speculators with relatively small supplies of capital–not that such lots are small enough for actual users. For instance, in the newspaper advertisement above, the reference to the "sophisticated small investor" is immediately followed by this example: "If you have $4400–and you believe gasoline prices will go up–you can purchase 2 tankloads of gasoline for 25 cents per gallon deposit at today's quoted price for late 1980 delivery."

A promotional letter used by Anglo American, Ltd., another Co Petro gasoline contract sales agent, under the salutation "Dear Investor," states that Anglo American has been appointed by Co Petro to offer gasoline contracts to "the private investor." In addition, Co Petro directly ran a number of large advertisements in various newspapers of general circulation, under the heading "INVESTORS", regarding seminars which Co Petro was holding to explain its investment vehicle to the general public. Use of advertisements in newspapers of general circulation–which are more expensive and attract a much broader audience than the less expensive, more narrowly focussed industrial trade journals with an audience of industrial end–users of fuel again indicates that Co Petro's marketing efforts centered on private investors who were not bulk users of fuel and, accordingly, could not take delivery of tens of thousands of gallons of gasoline. Indeed, Energy Investments Exchange, Inc., another sales agent for Co Petro contracts, in a letter to potential investors, even stated: "if you choose not to take physical delivery but would like your fuel purchase resold ... [and] [i]f you choose EIE (Energy Investments Exchange] as your resale broker, EIE *guarantees* that your fuel will be sold." No clearer recitation could be made that a small private investor would never need to take actual delivery of the physical product. Finally, the disclaimer provision in the investor's contract with Co Petro indicates Co Petro's anticipation of the need to protect itself from the wrath of dissatisfied, inexperienced small investors. In one version of the Co Petro contract, the investor was required to initial the following statement:

"I realize that a motor vehicle fuel purchase is a high risk speculative venture and I fully understand that I could lose most or all of my entire deposit and by virtue of my own business experience or independent advice, I am capable of evaluating the hazards and merits of this motor vehicle fuel purchase."

Although Co Petro used various sales agents, in addition to its direct efforts, to market the gasoline contracts, Co Petro carefully and tightly controlled these sales efforts. Morris of Dillon, Chase, West testified at his deposition that Co Petro acted as an intermediary in relaying responses to its newspaper advertisements for the gasoline contracts and in referring other leads to the sales agents. Morris further testified that his salesmen marketing the Co Petro contracts received instruction at meetings with Co Petro personnel, including defendants Krivacek and Harold Goldstein. Collins of Lawrence, Collins & Wexler testified that Co Petro provided the promotional materials he used to market the gasoline contracts and further observed that "I do not mail out anything that they [Co Petro] do not provide to me." Morris further testified that Co Petro provided the price and delivery date information necessary to fill in the blanks of the contract being offered to an investor. Finally, Collins testified that a courier would pick up the contract and check made out to Co Petro from the investor and deliver them directly to Co Petro's offices.

In summary, Co Petro's advertising and marketing efforts for its gasoline contracts for future delivery focussed in large part on private investors among the general public. Neither party had any true expectation that these small, private speculators would actually take delivery of tankloads of tens of thousands of gallons of gasoline. Rather, the investors entered into these transactions with Co Petro solely to speculate on changes in the price of gasoline in the future. Co Petro's contention that most of its customers were end–users interested in bulk supplies of gasoline is overly simplistic. Co Petro had clearly segmented its market for gasoline such that it was actually offering two different products: its brokerage activities on the spot market may have produced sales to end–users; however, as discussed above, the marketing approach for the gasoline contracts for future delivery was clearly aimed at speculators in the general public–a market predicated upon investment rather than consumption.

In addition to the "expectation of delivery" criterion, Co Petro contends that its "cash forward contracts" for gasoline are distinguishable from futures contracts on other grounds. As the House Committee Report notes, because futures contracts developed from cash forward contracts, they have many similar terms. *Commodity Futures Law Reports, supra,* 1047 at 1048. The Committee Report asserts that the essential difference between the futures contract and the cash forward contract is that both price and quality are specified at the time the futures contract is made. This distinction is evanescent and, accordingly, unhelpful here: it contradicts the Committee Report's earlier discussion of the cash forward contract as a means whereby a farmer or miller would be guaranteed a price for the commodity but could defer delivery until needed. Hence, a comparison between the Co Petro contract and the other facets of a futures contract is useful here.

First, defendants contend their contract lacks a principal characteristic of a futures contract: that all futures contracts for a particular commodity are identical, interchangeable, and fungible in quantity and terms so that offsetting transactions may be consummated with ease. Defendants contend their contract is personalized for each buyer, setting forth quantity and quality of fuel, price, and delivery terms as agreed upon by the parties. Defendants maintain these contracts are not interchangeable with other contracts, and hence one contract may not be liquidated by the purchase of an offsetting contract with identical quantity, quality, and delivery terms.

However, as plaintiff Commission points out, Co Petro itself makes the market in its gasoline contracts by acting as an intermediary between original buyers and buyers upon resale. Co Petro sells the contract to the original buyer. Then, as the delivery date nears, Co Petro merely resells the gasoline to one or more end–users. Delivery by Co Petro to a second purchaser upon resale has the same liquidation or offsetting effect upon the first buyer's contract as the liquidation of a futures contract via acquisition of an offsetting futures contract. Indeed, if the original buyer has no expectation of actual delivery, Co Petro might even write a new purchase contract for future delivery with another investor, using that second investor's downpayment to cover any profit the first investor might have earned on his contract.

Plaintiff contends that many of the terms of Co Petro's contracts with investors are in fact standardized. An important point to remember here is that Co Petro has segmented its sales of gasoline into submarkets, with end–users and private investors in separate realms. Thus, while Co Petro's contracts with industrial and commercial end–users could be drawn to reflect the individualized needs of these customers, the use of standardized contracts with the private investors is not foreclosed. Defendants contend that the quantity of fuel in Co Petro's contract is not fixed, but varies from contract to contract. However, defendants' expert, Richard J. Teweles, states in his declaration that the quantity per contract ranges from one to four tankerloads of fuel. In addition, a promotional document provided to the Commission by defendants contains the following:

"For your information, there are 8,800 gallons of gasoline or other fuel per tank truck load. Our minimum contract per customer for cash forward delivery is two tank trucks or 17,600 gallons. For unleaded gasoline only, the maximum is six tank trucks. * * * Cash forward delivery contracts are generally for six months plus.

| PRODUCT | TANKS | GALLONS | PER GALLON | DEPOSIT AMOUNT |
|---------|-------|---------|------------|----------------|
| Unleaded gasoline | 2 (minimum) | 17,600 | 20 cents | $ 3,520 |
| Unleaded gasoline | 6 | 52,800 | 20 cents | 10,560 |
| Diesel No. 2 | 2 (minimum) | 17,600 | 25 cents | 4,400 |
| Ethanol | 2 (minimum) | 17,600 | 25 cents | 4,400 |
| Heating Oil No. 6 | 1,000 barrels | 42,200 | 25 percent | (by quotation) |

Morris of Dillon, Chase, West, Inc., produced a similar table furnished by Co Petro for his use in his investment sales efforts. Therefore, the Co Petro contracts are as uniform in the size of their increments as futures contracts traded on established markets.

Plaintiff contends that Co Petro's contracts also employ uniform time periods: the date by which the investor must give notice of his intention either to accept delivery or to resell via Co Petro; the date by which the original buyer must render payment if he wishes to take delivery; and the date by which delivery is to be made by Co Petro. Defendants contend that these notices and delivery dates vary from contract to contract in accordance with the customer's needs and Co Petro's ability to obtain fuel allocations. Morris of Dillon, Chase, West stated at two different times in his deposition that the notice date is always fixed at the time of purchase and is always approximately eight months from the purchase date. Notice may not be given prior to the notice date. Defendants concede

that the delivery date is always ten days after the payment date.

Defendants contend that the Co Petro contract differs from a futures contract in that the price is determined by Co Petro and the buyer, as opposed to public auction in the case of futures. However, the evidence indicates the price was set unilaterally by Co Petro in accordance with then–prevailing market prices for such refined petroleum products. Thereafter, the spot market determines the resale price to the subsequent purchaser. Consequently, the price–setting mechanism employed by Co Petro is analogous to that employed for futures contracts.

Another distinction relied upon by defendants relates to the down payment rendered at the time the Co Petro contract is executed. Plaintiff characterizes such a "down payment" as "margin money" used to secure a commodity futures contract. Defendants, on the other hand, characterize the payment as security for subsequent delivery rights pursuant to a bona fide deferred delivery contract. Plaintiff argues that this "deposit" is always a fixed percentage of the total contract price, regardless of the size of the purchase, or the buyer's creditworthiness or ability to take delivery of the underlying commodity. Defendants dispute this contention, arguing that the deposit is tailored to meet the customer's individual needs and capacities. Once again, however, defendants apparently are attempting to blur the distinction between the manner in which they deal with industrial and commercial end–users and the manner in which they deal with private investors unable to take delivery. Contracts with end–users are likely to be more carefully tailored to such customers' creditworthiness since they, by definition, could likely take delivery. As to the private investors, however, the "deposits" do seem to correspond more to a fixed percentage of the total price. In the Co Petro chart reproduced above, this deposit was stated as a standard, per–gallon figure for all purchasers. Morris of Dillon, Chase, West testified that the deposit figures used by Co Petro had not changed in seven months.

Defendants maintain this deposit is not margin money because a buyer is not subject to "margin calls"–demands from the seller to the buyer to increase the amount of the "down payment" because the value of the underlying commodity used to secure the futures contract has fallen. True, purchasers of Co Petro contracts are never called upon to increase the size of their down payments. However, the contractual provision for a specific figure of liquidated damages in the event of cancellation by either party limits the amount of a buyer's liability. Hence, if the spot price of gasoline falls significantly as the delivery date nears, the buyer may simply cancel his contract with Co Petro, losing only the liquidated damages, an amount which generally approximates his deposit. Plaintiff analogizes this provision as a "stop–loss" order on an open commodity futures contract wherein the contract is to be liquidated if the price of the commodity falls below a certain level.

■ Consideration of the respective provisions of Co Petro's "cash forward contract" for fuel and the standard futures contract, of the parties' expectation of no actual delivery to the original buyer under the Co Petro contract, and of the legislative history underlying the exclusion of cash commodities from the scheme of futures regulation compels the conclusion that the Co Petro contract is "a contract for the purchase or sale of a commodity for future delivery"–namely, a futures contract–rather than a contract for "sales of a cash commodity for deferred shipment or delivery." Defendants Co Petro, Harold Goldstein, Daniel Goldstein, and Michael Krivacek are not properly registered with plaintiff Commission. The trading of Co Petro's gasoline futures contracts was not done on a contract market designated by the Commission, in violation of 7 U.S.C. § 6. Similarly defendants conducted a business for the purpose of soliciting and making gasoline futures contracts, and such orders, contracts, and dealings were not executed by

or through a member of a proper contract market, in violation of 7 U.S.C. § 6h.

## IV. REMEDIES AVAILABLE FOR VIOLATIONS OF THE COMMODITY EXCHANGE ACT

Plaintiff Commission seeks the following remedies from the Court: (1) a preliminary and permanent injunction barring defendants and persons acting in concert with them from "directly or indirectly, offering to enter into, entering into, or confirming the execution of commodity futures contracts"; (2) appointment of a receiver to take control of all assets and property held by defendants; (3) a freeze on the assets of all defendants; (4) an accounting of all assets and liabilities of defendants and of all funds received and paid out since July 1, 1979; and (5) disgorgement of all gains received by defendants as a result of the activities which violated the Commodity Exchange Act, as amended, 7 U.S.C. § 1 *et seq.*

 Actions for statutory injunctions pursuant to the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation of the Act has been shown, the moving party need only show the existence of some reasonable likelihood of future violations. *Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Commodity Futures Trading Commission v. British American Commodity Options Corp.,* 560 F.2d 135, 141 (2nd Cir. 1977), *cert. denied,* 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978). Past unlawful conduct may be considered in the determination of likelihood of future violations. *Commodity Futures Trading Commission v. Hunt,* 591 F.2d at 1220 ("While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly suggestive of the likelihood of future violations.' [citations omitted]"); *Commodity Futures Trading Commission v. British American,* 560 F.2d at 142 ("A likelihood of future violations may be inferred from past unlawful conduct."). In drawing the inference from past violations that future violations may occur, the Court should look at the " 'totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.' [citations omitted]" *Hunt, supra,* 591 F.2d at 1220.

 Other circuits have looked to a variety of factors to determine the likelihood of future misconduct. The fact that a violator has continued to maintain that his conduct is blameless has prompted some courts to consider injunctive relief. *See Securities and Exchange Commission v. Shapiro,* 494 F.2d 1301, 1308 (2nd Cir. 1974); *Securities and Exchange Commission v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1101 (2nd Cir. 1972). Also, when a defendant persists in its illegal activities "right up to the day of the hearing in the district court ... the likelihood of future violations, if not restrained, is clear." *Commodity Futures Trading Commission v. Hunt,* 591 F.2d at 1220. As the Seventh Circuit noted in *Hunt,* when the violation has been predicated upon systematic wrongdoing, rather than isolated occurrences, a court should be more willing to enjoin future conduct; and when a defendant, because of his professional occupation or career interest, will be in a position in which future violations could be possible, relief is appropriate. 591 F.2d at 1220.

 In the case at hand, a continuous pattern of extensive violations of the Act by means of gasoline futures contracts is present. Defendants insisted that such transactions were not barred by the statute and continued their operations until the Court entered its Temporary Restraining Order. Defendants Harold and Daniel Goldstein have an extensive history of engaging in transactions involving, or relating to, commodity futures contracts. Defendants having shown such activity in this specialized field, it is reasonable to assume that they would continue to trade in gasoline futures contracts if left unimpeded by judicial action. Refusal to grant an injunction

in the face of a violation such as this would merely encourage others improperly to trade outside of designated contract markets in futures contracts for any number of commodities. Accordingly, an injunction of the type requested by plaintiff Commission is appropriate here, pursuant to 7 U.S.C. § 13a–1.

Plaintiff Commission maintains that the appointment of a receiver, an accounting, establishment of a trust, and disgorgement are necessary to insure that the public interest is adequately protected and that defendants do not profit from their unlawful activity. In *Commodity Futures Trading Commission v. Hunt*, 591 F.2d at 1223, the Seventh Circuit concluded that a district court may compel a violator of regulations promulgated under the trading limit provisions of the Commodity Exchange Act to disgorge his illegally obtained profits. The *Hunt* court considered the disgorgement cases which have arisen pursuant to the statutory expression of the court's equitable enforcement powers under section 27 of the Securities Exchange Act and noted that, although the Commodity Exchange Act lacked a parallel expression of equitable enforcement power, the authority to grant disgorgement is found in the traditional equity powers of a court, citing *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 19, 94 S.Ct. 1028, 1038, 39 L.Ed.2d 123 (1974). The *Hunt* court also relied upon *Porter v. Warner Holding Co.*, 328 U.S. 395, 399–400, 66 S.Ct. 1086, 1090, 90 L.Ed. 1332 (1946), in which the U.S. Supreme Court reasoned that an order for restitution could be justified either as an adjunct to an injunction decree or as "an order appropriate and necessary to enforce compliance with the [Emergency Price Control] Act"–statutory language identical to that in 7 U.S.C. § 13a–1 under which this action is brought.

■ Therefore, the Seventh Circuit concluded, although the Commodity Exchange Act contains no explicit expression of the court's equitable enforcement power, neither does it contain any provision restricting the traditional equity power of the district court; and hence disgorgement could

be an appropriate form of ancillary relief under the Commodity Exchange Act. To find otherwise, the *Hunt* court noted, would, as the Second Circuit observed in the Securities Exchange Act context, allow a violator to retain the profits from his violations and thereby frustrate the purposes of the regulatory scheme. *Commodity Futures Trading Commission v. Hunt*, 591 F.2d at 1223, citing *Securities and Exchange Commission v. Texas Gulf Sulphur*, 446 F.2d 1301, 1308 (2nd Cir. 1971), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

■ Finally, in *Commodity Futures Trading Commission v. Muller*, 570 F.2d 1296, 1300–1301 (5th Cir. 1978), the Fifth Circuit upheld the power of a district court to order a temporary freeze on the assets of a violator of the Commodity Exchange Act, noting that such a freeze was "reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event the court should ultimately order disgorgement...."

## V. EVIDENTIARY RULINGS

Plaintiff has requested the Court to take judicial notice of the following proceedings in which defendant Harold Goldstein has been involved: (1) *In the Matter of Harold Goldstein*, 33 Ag.Dec. 1130 (1974), issuance of a cease and desist order against Goldstein and a twenty–year prohibition against trading by Goldstein on any commodity exchange based upon findings by the U.S. Department of Agriculture that Goldstein had violated the Commodity Exchange Act by converting the funds of his commodity futures contract customers to his own use; (2) *Securities and Exchange Commission v. First Leisure Corporations*, Civil Action No. 72–2616–RJK (C.D.Cal.1972) in which Goldstein consented to the entry of a permanent injunction against his sale of unregistered securities, specifically options on commodities; (3) *Securities and Exchange Commission v. Goldstein, Samuelson, Inc.*, Civil Action No. 73–472–RJK (C.D.Cal.1973) in which Goldstein again consented to the en-

try of a permanent injunction against his sale of unregistered securities, specifically options on commodities; (4) *United States v. Goldstein*, 72–1254 (C.D.Cal.1973), in which Goldstein pled guilty to three felony counts of mail fraud; and (5) *United States v. Goldstein*, CR 76–184A (N.D.Ga.1976), in which Goldstein was again convicted of mail fraud and of violations of the Securities Act of 1933. Defendants object to plaintiff's request on the ground that plaintiff is seeking to proffer evidence that defendant Harold Goldstein has a "propensity" to violate the law as a means of proving the existence of violations of the Commodity Exchange Act in the case at hand.

 As to this issue of judicial notice, the Court hereby takes judicial notice only of those proceedings which have occurred in this Court, the Central District of California, and declines to take judicial notice of any other proceedings. The Court takes judicial notice of the past proceedings in the Central District only for the limited purpose of establishing defendant Harold Goldstein's past participation in commodities markets as such participation relates to formulation of the appropriate remedy here.

 As to the amended declarations of Douglas L. Campbell and Daniel A. Driscoll, defendants raise objections to a number of portions of the declarations. Defendants' statement of objections to the declarations shall be deemed a motion to strike, and the memoranda submitted by the parties with respect thereto shall be deemed memoranda on the motion. The Court ORDERS that defendants' motion to strike is GRANTED.

## VI. ORDER

Having in mind defendant Harold Goldstein's past involvement in commodity investment schemes and the need to deter Goldstein and others from violation of the statutory framework for regulation of commodity futures trading, the Court finds the following remedies to be appropriate here.

### A.

It is hereby ORDERED, ADJUDGED, AND DECREED that all defendants are permanently enjoined from offering to enter into, entering into, or otherwise engaging in transactions in, commodity futures contracts relating to petroleum products;

### B.

It is further ORDERED, ADJUDGED, AND DECREED that:

(1) Victor R. Hansen, 1000 Sunset Boulevard, 2nd Floor, Los Angeles, California 90012, (213) 629–3171, is designated as Receiver to oversee the orderly and expeditious identification, preservation, management, and control of all assets and liabilities of defendant Co Petro;

(2) the Receiver is required to inventory and collect all property and assets of defendant Co Petro and, with the approval of the Court, convert such assets into money or take such other action as is permitted or required by any applicable law;

(3) the defendants are required to deliver all assets and property of defendant Co Petro which are or may be in their possession or control to the Receiver at his direction;

(4) under the supervision of the Receiver, an accounting shall be made of all assets and liabilities of defendants Harold Goldstein, Daniel Goldstein, Michael Krivacek, and Co Petro and of all funds received and paid out by such defendants since July 1, 1979;

(5) the Receiver is empowered to take all such other action and require the defendants to do such other acts as the Receiver may deem just and equitable, under law;

(6) the Receiver shall qualify for his position by filing an undertaking for his faithful performance with the Clerk of this Court. Said bond is to be made in the sum of $100,000;

### C.

It is further ORDERED, ADJUDGED, AND DECREED that the defendants in their individual or in any other capacities, are enjoined from utilizing, diverting,

transferring, altering, destroying or in any other manner whatsoever—either directly or indirectly—dealing with the assets or property of defendants Co Petro and Harold Goldstein, or any other assets or property related—either directly or indirectly—to defendants Co Petro and Harold Goldstein, or interfering with, hindering or impeding the orderly identification, preservation, management, and control of all such assets by the Receiver.

### D.

It is hereby further ORDERED, ADJUDGED AND DECREED that defendants, their agents, employees, servants, affiliates, officers, directors, successors, assigns, and all other persons acting in active concert or participation with them, and each of them, or under their direction or control, be and hereby are:

(1) ordered to grant the Receiver or his designated agents reasonable access, during normal business hours, to all notes, memoranda, recordings, books, records, books of account, ledgers and documents, including correspondence, public documents, public announcements, any statements or other documentation filed or submitted or required to be filed or submitted to a government or governmental agency, records of shareholders' meetings and of Board of Directors' meetings, and any other form of documentation without limitation, in the custody or control of defendants which relate in any manner to the business operations of defendant Co Petro.

### E.

It is hereby further ORDERED, ADJUDGED AND DECREED that all payments received by defendants Harold Goldstein, Daniel Goldstein, Michael Krivacek, and Co Petro from their activities here found to be in violation of law shall be disgorged. The Receiver appointed by the Court is to identify, take possession of, manage, and control such monies until further Order of this Court.

### F.

It is further ORDERED, ADJUDGED AND DECREED that the Court reserves the right to make and enter such further orders and decrees upon the application of the Receiver appointed herein or that may be necessary for the guidance of said Receiver in his performance of the duties herein established.

### G.

It is further ORDERED, ADJUDGED AND DECREED that this Court retain jurisdiction in order to implement and carry out the terms of this Order and to entertain any suitable application or motion by the parties to this action for additional relief, including review of any action of the Receiver, within the jurisdiction of this Court, provided application for such review or relief is made within fifteen (15) days of the Receiver's action for which review or relief is sought, unless such time shall have been enlarged by the Receiver.

### H.

And it is further ORDERED, ADJUDGED AND DECREED that this Order be and remain in full force and effect until further Order of this Court and be served forthwith upon the Receiver and all parties.

### APPENDIX

*Hearings on Futures Trading in Grain*, Senate Committee on Agriculture and Forestry, 67th Cong., 1st Sess., 212–214 (1921):

George T. McDermott (representative of the Kansas Grain Dealer's Association): "Now, as I understand . . . Sen. Capper's original intention, it was simply to affect futures transactions and not to interfere with cash grain. The Senator now has inserted that subsection [an earlier version of the cash commodity exclusion eventually adopted], where the seller is the owner of the grain, for the purpose of eliminating cash transactions. Then on the futures trades, Sen. Capper says in his original bill, 'We will tax them all, except where they are made upon contract markets, which are supervised by the Secretary of Agriculture.' "

\*　　\*　　\*　　\*　　\*　　\*

McDermott: "A hasty examination of this bill was made by a gentleman who, after he made it, reported that, in his judgment, that *Section 4 as it stood in Sen. Capper's bill and Mr. Tinchner's original bill*—they were carbon copies of each other—*would prohibit a farmer from selling his cash grain to anybody unless it went through the board of trade.* * * [S]o they inserted those words, 'made at, on, or in any exchange or board of trade' so that we would not tax the farmer in selling his wheat to the mill. [emphasis supplied.]

"My suggestion about the matter is this, that you cut out those words so that you tax all the grain for future delivery, but in order that there may be no misunderstanding about that, the spot or cash market is not affected, that in the definitions over on page 1, at the end of line 11, there should be words inserted similar to these—"

The Chairman: "After the word 'sorghum'?"

McDermott: "Yes, sir. "The words 'future delivery' shall not be held to include any sale of cash grain for deferred delivery.' That would make it clear that it did not affect cash grain."

The Chairman: "Give us those words again, please."

McDermott: "I have it in typewritten form, sir."

The Chairman: "I want to make a note of them."

McDermott: " '*The words "future delivery" shall not be held to include any sale of cash grain for deferred shipment.*' " [emphasis supplied.]

The Chairman: "All right."

\* \* \* \* \* \*

McDermott: "The words 'cash grain for deferred shipment' do have a technical meaning."

Senate Hearings, *supra*, at 461–463:

Sen. Capper: "The amendments [adding the language: "The term 'future delivery' as used herein shall not be held to include any sale of cash grain for de-ferred shipment."] was put in by the House Committee, as I understand, toward the close of the hearings, on the assumption that unless those words were in it would *interfere with a man selling his own grain*. If you want to be entirely sure that this bill does not affect cash transactions, the amendment [cited above] ... will clear up that doubt...." [emphasis supplied.]

61 *Cong.Rec.* 4762, 67th Cong., 1st Sess., August 9, 1921:

Sen. Capper: "[T]hese evils ... all grow out of dealings in futures. The bill does not touch any transaction in cash grain, for it is expressly provided in the definition section that it shall not include any cash grain for deferred shipment. * * Let me repeat that the bill does not concern itself at all with the sale or purchase of *actual grain*, either for present or future delivery. The entire business of buying and selling the *actual grain*, sometimes called 'cash' or 'spot' business, is expressly excluded. It deals *only* with the 'future' or 'pit' transaction in which the *transfer of actual grain is not contemplated*." [emphasis supplied.]